**TRUSTEES OF the FOUR JOINT BOARDS HEALTH AND WELFARE AND PENSION FUNDS, Plaintiffs,**

v.

**PENN PLASTICS, INC., Defendant.**

**No. 93 Civ. 3216 (PKL).**

United States District Court,
S.D. New York.

Sept. 28, 1994.

---

Lillian S. Weigert, Gellert & Cutler, P.C., Poughkeepsie, NY, for plaintiffs.

Andrew Heymann, Devos and Co., New York City, for defendant.

LEISURE, District Judge:

This is an action to recover delinquent employee-benefit-fund contributions. Plaintiffs are the Trustees of the Four Joint Boards Health and Welfare and Pension Funds (the "Trustees" or the "Funds").[1] Defendant is Penn Plastics, Inc. ("Penn Plastics"), a Pennsylvania corporation, with its principal place of business at Creighton, Pennsylvania. The Trustees assert liability under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001, *et seq.*, and a collective bargaining agreement entered into between Penn Plastics and the International Leather Goods, Plastics, Novelty Workers Union (the "Union"). This Court has subject matter jurisdiction pursuant to ERISA § 502, 29 U.S.C. § 1132, and § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 (1947).

The Trustees have moved for summary judgment pursuant to Fed.R.Civ.P. 56 ("Rule 56"). For reasons stated below, the Trustees' motion is granted as to liability but denied as to damages.

## BACKGROUND

Penn Plastics and the Union entered into a collective bargaining agreement that purported to be effective during the three-year period from February 1, 1991 through January 31, 1994 (the "Collective Bargaining Agreement"). The Collective Bargaining Agreement expressly obligated Penn Plastics to make monthly contributions to the Funds, in amounts that would increase each year according to a formula and a procedure described in the Collective Bargaining Agreement. However, Penn Plastics encountered serious financial difficulties and, as of August 1992, became delinquent in its contributions to the Funds.

On December 4, 1992, Penn Plastics and the Union entered into an amendment to the Collective Bargaining Agreement (the "Amendment"). The Funds were not parties to the Amendment. According to Penn Plastics, the Amendment was intended, *inter alia*, to avert the annual increases in required rates of contributions to the Funds that, under the Collective Bargaining Agreement, were to take effect on February 1, 1993.

The Trustees filed this action on May 13, 1993, seeking delinquent contributions and a variety of ancillary relief.

## DISCUSSION

The Trustees have moved for summary judgment with respect to each aspect of the relief that they have requested. Penn Plastics has not disputed that it is liable to the Funds for some amount of delinquent contributions, for prejudgment and penalty interest, and for attorneys' fees and costs. Rather, Penn Plastics disputes the amounts of delinquent contributions, prejudgment and penalty interest, and attorney's fees that are owed. Penn Plastics also disputes whether it is liable for auditors' fees and, if so, the amount thereof.

## I. THE SUMMARY JUDGMENT STANDARD

"Summary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir.1993). In deciding the motion, "the Court is required to draw all factual inferences in favor of the party against whom summary judgment is sought." *Balderman v. U.S. Veterans Administration*, 870 F.2d 57, 60 (2d Cir.1989). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Cruden v. Bank of New York*, 957 F.2d 961, 975 (2d Cir.1992); *accord Taggart v. Time, Inc.*, 924 F.2d 43, 46 (2d Cir.1991).

1. The Trustees are fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21). The Health and Welfare Fund is an employee welfare benefit plan within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1). The Pension Fund is an employee pension benefit plan within the meaning of ERISA § 3(2), 29 U.S.C. § 1002(2). The Funds are multi-employer benefit plans within the meaning of ERISA §§ 3(3) and 3(37), 29 U.S.C. §§ 1002(3) and 1002(37).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" and identifying the materials in the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once a motion for summary judgment is properly made and supported, however, the burden shifts to the nonmoving party to " 'set forth specific facts showing that there is a genuine issue for trial.' " *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)).

■■■ In a dispute involving a contract's meaning, summary judgment may be granted if the contract's language is plain and unambiguous. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 148 (2d Cir.1993); *Seiden Assoc., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992). A contract's language is unambiguous if there is " 'no reasonable basis for a difference of opinion' " as to the contract's meaning. *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989) (quoting *Breed v. Insurance Co. of North America,* 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280, 1282 (1978)).

## II. DELINQUENT CONTRIBUTIONS

■■ The Trustees' principal claim is that, as a matter of law, pursuant to ERISA § 515, Penn Plastics is liable for delinquent contributions at a rate to be determined in accordance with the Collective Bargaining Agreement and not in accordance with the Amendment. Penn Plastics offers a different interpretation of § 515 and argues that summary judgment is inappropriate on this point because there is a genuine issue of material fact as to the proper interpretation of the

Amendment—namely, whether the Amendment was intended to avert the annual increases in required rates of contributions to the Funds that, under the Collective Bargaining Agreement, were to take effect on February 1, 1993.[2]

ERISA § 515 provides:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or agreement.

29 U.S.C. § 1145. The considerations that animated Congress' passage of this section have been explored at some length in several of the Circuit Courts of Appeals, *see, e.g., Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc.,* 870 F.2d 1148, 1151–56 (7th Cir.1989) (*en banc* ) (Easterbrook, J.); *Bituminous Coal Operators' Association, Inc. v. Connors,* 867 F.2d 625, 632–36 (D.C.Cir.1989) (D. Ginsburg, J.); *Southern California Retail Clerks Union & Food Employers Joint Trust Fund v. Bjorklund,* 728 F.2d 1262, 1265–66 (9th Cir.1984), including the Court of Appeals for the Second Circuit, *see Benson v. Brower's Moving & Storage, Inc.,* 907 F.2d 310, 313–16 (2d Cir.1990). The Court will briefly review those considerations here.

Multiemployer plans, such as the Funds, operate on a so-called "defined-contribution in, defined-benefit out" basis. That is, this type of plan promises to pay out to beneficiaries a defined rate of benefits, which the plan calculates in reliance on participating employers' promises to pay in a defined rate of contributions. The rates at which individual employers promise to pay in to the plan are set forth in written agreements. These

---

**2.** Penn Plastics also argues that summary judgment is improper on this point because certain reports that underlie the Trustees' calculations of delinquent contributions are not in evidence. The Court finds this argument without merit. There is no dispute that Penn Plastics provided the reports in question to the Funds. Moreover, Penn Plastics has not argued that the Trustees' calculations of delinquent contributions misrepresent in any way the contents of the reports in

question. Penn Plastics has not, for example, submitted an affidavit disputing the numbers of employees that were covered by the relevant provisions of the Agreement during the months in question. As a result, the fact that the reports are not in evidence does not preclude summary judgment for the Trustees on the amount of delinquent contributions. *Cf. Tamarin v. Adam Caterers, Inc.,* 13 F.3d 51 (2d Cir.1993).

agreements often take the form of collective bargaining agreements entered into between an employer and a union, which name the plan as a third-party beneficiary. When, for whatever reason, an individual employer breaks its promise to contribute at the rate defined in the written agreement, other participating employers must contribute at higher rates, or the plan must default on its own promises to beneficiaries.

The Supreme Court recognized this point among others in *Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 466–71, 80 S.Ct. 489, 493–96, 4 L.Ed.2d 442 (1960), well before the enactment of § 515.[3] There, the Court held that a multiemployer benefit fund could enforce an employer's promise to contribute to the fund, as set forth in a collective bargaining agreement, even though the union had breached the agreement. The employer could not raise the union's breach as a defense in a suit by the multiemployer fund, where the collective bargaining agreement had not preserved such a defense "in unequivocal words." *Id.* at 470–71, 80 S.Ct. at 496; *Benson,* 907 F.2d at 312.[4] The Court reasoned, in part, that other employers participating in the multiemployer fund would not have been "willing to risk the threat of diminution of the fund in order to protect those of their number who might have become involved in local labor difficulties" and that many beneficiaries of the fund "may be retired, or may be dependents, and therefore without any direct voice in the conduct of union affairs." *Benedict Coal,* 361 U.S. at 469–70, 80 S.Ct. at 496.

In the wake of *Benedict Coal,* some employers seeking relief from promises that they had made to contribute to multiemployer plans took a different tack. They argued, not that their duties to pay had been discharged or modified by union conduct that occurred after the collective bargaining agreement had become effective, but rather that their duties had never come into existence because no valid collective bargaining agreement had ever been formed. *See Benson,* 907 F.2d at 313. Courts accepted this argument by employers in at least two cases that caught the eyes of the sponsors of § 515, *Washington Area Carpenters' Welfare Fund v. Overhead Door Co. of Metropolitan Washington,* 488 F.Supp. 816, 819 (D.D.C. 1980) (accepting "defense in the instant case, [because it] . . . concerns the validity of the very agreement" that allegedly gave rise to employer's obligation to contribute), *rev'd* 681 F.2d 1 (D.C.Cir.1982), *cert. denied,* 461 U.S. 926, 103 S.Ct. 2085, 77 L.Ed.2d 296 (1983), and *Western Washington Laborers–Employers Health & Security Trust Fund v. McDowell,* 103 L.R.R.M. 2219 (W.D.Wash. 1979), *rev'd* 673 F.2d 1341, *cert. denied,* 461 U.S. 926, 103 S.Ct. 2084, 77 L.Ed.2d 296 (1983).

Congressional sponsors of § 515 believed, however, that "[f]ederal pension law must permit trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor management relations law. . . ." 126 Cong.Rec. 23039 (remarks of Rep. Thompson, House manager for § 515); *see also id.* at 23288 (remarks of Sen. Williams, Senate manager for § 515, quoting Rep. Thompson). The sponsors expressly "endorse[d] judicial decisions such as . . . *Benedict Coal,*" and in the sponsors' view, "[c]ases such as . . . *McDowell* and . . . *Overhead Door* . . . [were] incorrectly decided." *Id.* at 23039, 23288.

Against this backdrop, it should come as no surprise that, pursuant to § 515, the Circuit Courts of Appeals have consistently held employers to their promises to contribute to

---

3. The Supreme Court rendered its decision in *Benedict Coal* pursuant to the authority conferred on the federal courts by LMRA § 301 "to fashion a body of federal law for the enforcement of collective bargaining agreements." *Benedict Coal,* 361 U.S. at 470, 80 S.Ct. at 496 (citing *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957)).

4. The Court thus established an exception to the general rule applicable to third-party beneficiary contracts, that "the intended beneficiary's . . . right . . . is generally subject to any defenses . . . of the promisor against the promisee arising out of th[e] contract." Farnsworth, Contracts § 10.9, at 772 (2d ed. 1990) (noting that, under *Benedict Coal,* collective bargaining agreements are an exception to the general rule); *see also Benson,* 907 F.2d at 313 (same).

multiemployer plans as set forth in written agreements.[5]

In light of the foregoing, the Court finds that ERISA § 515 precludes Penn Plastics from relying on the argument that the Amendment modified or discharged Penn Plastics' contribution obligations set forth in the Collective Bargaining Agreement. Section 515 "entitles [multiemployer] ... funds to rely upon, and to enforce, the written terms of collective bargaining agreements insofar as they relate to ... contributions." *Connors*, 867 F.2d at 633. Allowing Penn Plastics to reconsider its promises two years after entering into the Collective Bargaining Agreement would defeat the concerns that underlie § 515. For if Penn Plastics could modify or discharge its obligations to the Funds by renegotiating only with the Union, so could other contributing employers. The Funds' reasonable, foreseeable, and detrimental reliance on employers' promises to contribute would be frustrated. If other employers (understandably) proved unwilling to contribute more than they initially committed to, the Funds would be forced to break their own promises to beneficiaries.

Furthermore, as was true in *Benedict Coal*, many beneficiaries of the Funds "may be retired, or may be dependents, and therefore without any direct voice in the conduct of union affairs," *Benedict Coal*, 361 U.S. at 470, 80 S.Ct. at 496. The willingness of the Union to renegotiate with Penn Plastics cannot, in this light, be imputed to all of the Funds' beneficiaries.

■ Finally, Penn Plastics' argument that the Amendment controls the extent of its contribution obligations is similar in important respects to an argument that the Second Circuit flatly rejected in *Benson*. There, the employer argued that it had ceased to comply with the collective bargaining agreement at issue and that the union had acquiesced in the employer's non-compliance. As a result, in the employer's view, a valid collective bargaining agreement had ceased to exist. Assuming *arguendo* that the employer was correct in this, the Second Circuit held that the invalidation of the collective bargaining agreement by the employer and the union provided the employer no defense in an action by a multiemployer plan seeking contributions. *Benson*, 907 F.2d at 315–16. Here, Penn Plastics argues, in substance, that by the Amendment, Penn Plastics and the Union invalidated the Collective Bargaining Agreement to the extent that it called for increases in the rates of Penn Plastics' contributions to the Funds beginning February 1, 1993. Under *Benson*, this argument fails.[6]

---

**5.** *See, e.g., Benson*, 907 F.2d at 314–16 (rejecting as against multiemployer plan, defense that employer and union had "abandoned" written collective bargaining agreement that gave rise to employer's contribution obligation); *Gerber Truck*, 870 F.2d at 1148, 1151–56 (rejecting as against multiemployer plan, defense that employer and union had oral understanding that employer need not make contributions on behalf of all employees covered by contribution obligation set forth in collective bargaining agreement); *Southwest Admrs., Inc. v. Rozay's Transfer*, 791 F.2d 769 (9th Cir.1986) (rejecting as against multiemployer plan, defense that employer was fraudulently induced to enter into written collective bargaining agreement that gave rise to contribution obligation), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 999 (1987); *cf. Maxwell v. Lucky Construction Co.*, 710 F.2d 1395 (9th Cir.1983) (rejecting as against multiemployer plan, defense that employer had paid, and could not recoup, identical amount of contributions to another plan pursuant to oral agreement with union, and employee would receive benefits from other plan) (relying on LMRA § 302(c)(5)); *but cf. Operating Engineers Pension Trust v. Gilliam*, 737 F.2d 1501, 1503–05 (9th Cir.1984) (allowing employer to raise as against multiemployer plan, defense that employer was unaware that he was signing collective bargaining agreement that allegedly gave rise to contribution obligation).

**6.** The conclusion that the extent of Penn Plastics' liability to the Funds is governed by the Collective Bargaining Agreement and not by the Amendment is entirely consonant with the result that would have obtained if § 515 had never been enacted. Absent that provision, the extent of Penn Plastics' obligations under the Collective Bargaining Agreement would have been determined in accordance with the federal law of collective bargaining agreements that exists pursuant to LMRA § 301. But a promisor and promisee are not free to modify or discharge the promisor's duty to an intended third-party beneficiary of the contract after the beneficiary's rights have vested. *See* Farnsworth, Contracts § 10.8, 768–69 (collecting authorities). Here, the Funds were intended third-party beneficiaries of the Collective Bargaining Agreement, but were not parties to, and did not otherwise consent to, the Amendment. Thus, the Amendment, entered into two years after the execution of the Collective Bargaining Agreement, is ineffective as against the Funds. *Cf. Benedict Coal*, 361

In conclusion, Penn Plastics' liability to the Funds for delinquent contributions is governed by the Collective Bargaining Agreement and not by the Amendment, as a matter of law. Any issue of fact that may exist concerning the proper interpretation of the Amendment is therefore not "material" within the meaning of Rule 56, and summary judgment against Penn Plastics on this point is proper.[7]

## III. PREJUDGMENT INTEREST AND PENALTY INTEREST

■ Neither party disputes that, as a matter of law, pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) (1974), the Trustees may recover twice the amount of interest that has accrued on Penn Plastics' unpaid contributions. *See, e.g., Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 285 (2d Cir. 1992) (stating that § 1132(g) provides for recovery of double interest in delinquent-contributions cases). Rather, the parties dispute the manner in which the interest that is owed should be calculated. The Trustees argue that interest should be calculated on the entire amount of delinquent contributions as if the entire amount had been due from the date of the first delinquent contribution. Penn Plastics, relying on *Carriers Container Council, Inc. v. Mobile S.S. Assoc., Inc.,* 948 F.2d 1219 (11th Cir.1991), argues that interest should be calculated on each delinquent contribution as of the date that the particular contribution came due.[8] Penn Plastics further argues that, for purposes of calculating the interest that is owed, the periodic payments that Penn Plastics made to reduce the extent of its delinquency should be credited against its outstanding balance as of the date that each payment was made.

The Court finds that Penn Plastics' positions represent the better view, as a matter of law. The Eleventh Circuit held in *Carriers Container* that, in an action to recover delinquent withdrawal liability payments under 29 U.S.C. § 1132(g), interest on each payment should begin to accrue when the particular payment becomes delinquent and not sooner. *Id.* at 1222–25. The Eleventh Circuit recognized that § 1132(g) does not specify when interest should begin to accrue on a delinquent withdrawal liability payment or a delinquent contribution. The Eleventh Circuit relied instead on 29 U.S.C. § 1399(c)(3) (1974), which provides that interest on delinquent withdrawal liability payments "shall accrue from the due date until the date on which the payment is made." *Id.* at 1223. The Eleventh Circuit reasoned that the "only difference between the two sections is that § 1399(c)(3) contemplates payment of interest without the necessity of filing suit, while § 1132(g) governs the interest calculation when suit is filed to collect the delinquent payment." *Id.*

The Trustees offered no reply to Penn Plastics' argument, and the Court's research discovered no contrary authority. The Court finds the Eleventh Circuit's analysis persuasive and adopts it here.[9]

It is a short step from the foregoing to the conclusion that, for interest calculation purposes, Penn Plastics' periodic payments toward its outstanding balance should be credited in its favor as of the date that each payment was made. If interest should not begin to accrue until a contribution becomes delinquent, there is no reason that it should continue to accrue after the payment ceases

U.S. at 470–71, 80 S.Ct. at 496 (under federal law of collective bargaining agreements, events that transpired between employer (promisor) and union (promisee) subsequent to execution of collective bargaining agreement did not discharge or modify employer's duty, set forth in collective bargaining agreement, to contribute to multiemployer fund (beneficiary)).

7. The Court has not discussed the amount of delinquent contributions that Penn Plastics owes, for reasons that are set forth in Part VI below.

8. The Court finds that interest should be calculated on a simple, rather than compound basis, for

reasons set forth in *Carriers Container,* 948 F.2d at 1224–25 (11th Cir.1991). In addition, the Court notes that Penn Plastics has not disputed the interest rates that the Trustees have used to calculate the interest that is due.

9. The Court finds immaterial the fact that *Carriers Container* was an action for delinquent withdrawal liability payments, while this is an action for delinquent contributions. *Cf.* 29 U.S.C. § 1451 (1980) ("any failure of the employer to make any withdrawal liability payment within the time prescribed shall be treated in the same manner as a delinquent contribution").

to be delinquent. Thus, § 1132(g) provides for prejudgment and penalty interest only on "unpaid" contributions.

In conclusion, the Trustees may recover twice the interest that has accumulated on Penn Plastics' unpaid contributions, calculated as described above.[10]

## IV. ATTORNEYS' FEES

Neither party disputes that, as a matter of law, pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) (1974), the Trustees may recover "reasonable attorney's fees." The Trustees argue, however, that they are entitled to the full amount of attorney's fees set forth in their counsel's billing reports (approximately 43 hours), plus additional attorney's fees that the Trustees expected to incur in replying to Penn Plastics' opposition to this motion and that the Trustees expect to incur in enforcing a summary judgment in the Funds' favor (approximately 30 hours). *See* Affidavit of Gilbert Andrade ("Andrade Aff.") at Exh. D (presenting billing reports of Trustees' counsel) *id.* at Exh. C ¶ 4 (presenting Affidavit of Lillian Weigert, Trustees' counsel). Penn Plastics responds, in substance, that the lawyer's billing reports are so vague as to call into question whether the time recorded was actually spent on this matter. *See* Defendant's Rule 3(g) Statement, filed January 10, 1994, at ¶ 7.[11]

■ "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (considering "reasonableness" of attorney's fee award under 42 U.S.C. § 1988). One important consideration in determining the "reasonableness" of the number of hours assertedly expended on a litigation is the specificity with which the attorney has described the tasks accomplished during the time charged. *See New York State Association for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1145–48 (2d Cir.1983) (requir-

ing "contemporaneous time records ... specify[ing], for each attorney, the date, the hours expended, and the nature of the work"); *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939 ("The party seeking an award of fees should submit evidence supporting the hours worked.... Where the documentation of hours is inadequate, the district court may reduce the award accordingly."). Among the many other factors that the district court may consider important are the novelty or complexity of the legal issues involved, the amount of money at stake, and the results obtained. *See United States Football League v. National Football League,* 887 F.2d 408, 415 (2d Cir.1989). Ultimately, " 'the district court has discretion in determining the amount of a fee award,' " *id.* (affirming district court's exercise of discretion) (quoting *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941); *DeVito v. Hempstead China Shop,* 831 F.Supp. 1037 (E.D.N.Y.1993) (involving § 1132(g)(2) action); *Bourgal v. Lakewood Haulage,* 827 F.Supp. 126, 129 (E.D.N.Y.1993) (same); however, "the district court [should] ... provide a concise but clear explanation of its reasons." *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941.

■ The Court finds that sixty-six (66) hours of time represents a reasonable number of hours for use in calculating a reasonable attorney's fee in this litigation. This figure represents approximately a 10 percent reduction in the number of hours that the Trustees' counsel has claimed. The principal reason for the reduction is that the Court's scrutiny of the billing reports revealed that they are somewhat vague, particularly so in spots. *See, e.g.,* Andrade Aff. at Exh. D (sometimes describing task as "Study and Review file," "Study and Review—strategy," "Telephone Call," or "Memo," without more). However, the Court is sensitive to the fact that it would be highly inefficient to require lawyers to record in great detail the nature of the tasks that they are performing. And here, counsel recorded many tasks with sufficient precision that the Court was able to

---

10. The Court has not discussed the amount of prejudgment and penalty interest that Penn Plastics owes, for reasons that are set forth in Part VI below.

11. Penn Plastics has not disputed the reasonableness of the $150 per hour rate that counsel has applied to the time charges to determine the total attorney's fee. *See id.*

conclude with confidence that the time charged was spent on this matter. For example, many entries refer to other individuals who are in involved in this action, such as the Court, opposing counsel, a representative of the Funds, and one of the auditors. *See id.* In addition, counsel recorded the time charges in one-tenth of an hour segments, hardly an imprecise measure for this purpose. *See id.* The Court further finds that this action was not a particularly complex or novel one; however, the amount at stake, roughly $200,000, was significant. Finally, the Court finds that the Trustees' counsel was largely, though not entirely, successful in obtaining the relief that the Trustees' sought.

For these reasons, the Court concludes that 66 hours is a reasonable number for use in calculating a reasonable attorney's fee. Multiplying this number of hours by the $150 per hour rate charged, the Court finds that the Trustees are entitled to $9900 in reasonable attorney's fees.

## V. AUDITOR'S FEES

■ The Trustees argue that, as a matter of law, pursuant to Articles 19 and 19–A of the Collective Bargaining Agreement, Penn Plastics is liable for auditor's fees as reflected in the auditor's billing reports submitted in support of the Trustees' motion. Penn Plastics contends: (1) that it is not liable for auditor's fees, as a matter of law pursuant to Articles 19 and 19–A; and (2) that, in any event, there is a genuine issue of material fact as to the amount of those fees.

The relevant language of Article 19 is identical to that of Article 19–A and provides as follows:

> The Trustees of the ... Fund[s] shall be entitled to audit the employers [sic] books on a periodic basis. In the event a substantial discrepancy is found between the amount reported or paid by the employer and the amount determined to be due by the audit, the employer shall be responsible for the cost of the audit.

> In the event the employer is delinquent in its required contributions to the ... Fund[s], the Trustees of the ... Fund[s] may commence legal action against the employer without notice and may sue for the contributions due together with costs

of the audit, interest, penalty interest, liquidated damages, attorneys fees, costs and disbursements all provided by *ERISA.*

Affidavit of Mark L. Lasser ("Lasser Aff.") at Exh. B. The Trustees argue that, under Articles 19 and 19–A, Penn Plastics is liable for audit expenses because Penn Plastics was delinquent in its contributions when the audit was conducted. Penn Plastics responds that Articles 19 and 19–A make the employer liable for audit expenses only when the audit reveals a substantial discrepancy between the amount reported and the amount due and that the audit at issue here did not reveal such a discrepancy.

The Court finds that, as a matter of law, Penn Plastics is liable for audit expenses pursuant to Articles 19 and 19–A. Under the plain language of those provisions, "the employer shall be responsible for the costs of the audit" under either of two conditions: (1) "a substantial discrepancy is found between the amount *reported* ... by the employer and the amount determined to be due by the audit"; or (2) "a substantial discrepancy is found between the amount ... *paid* by the employer and the amount determined to be due by the audit." *Id.* (emphasis added). Penn Plastics contends merely that there was no substantial discrepancy between the amount reported and the amount determined to be due, not that there is no substantial discrepancy between the amount that Penn Plastics has paid and the amount determined to be due. *See* Lasser Aff. at ¶¶ 7–10. Indeed, it is precisely because Penn Plastics became "delinquent in its required contributions," *id.* at Exh. B, that the Trustees commenced this action. Under these circumstances, summary judgment as to the contract's meaning is proper. *See, e.g., Kinek v. Paramount Communications,* 22 F.3d 503, 508–12 (2d Cir.1994) (affirming grant of summary judgment in ERISA action based on contract's language alone, where language was unambiguous).

■ Although Penn Plastics is liable for some amount of audit expenses as a matter of law, the Court finds that the auditors' billing reports submitted in support of the Trustees' motion provide an inadequate basis

upon which to award the auditors' fees and expenses claimed. The Trustees have submitted only a two-sentence description of the tasks that two auditors claim to have performed over a 22.75 hour period. *See* Andrade Aff. at Exh. D. This is insufficient. First, the report on its face indicates that it was prepared almost two and one-half months after an initial invoice for the services and expenses was sent to the Funds. As a result, the Court cannot conclude that the report is a contemporaneous record of the services assertedly performed or the expenses incurred. Moreover, the report does not specify how much time each of the two auditors spent on any of the tasks described. *See Carey,* 711 F.2d at 1145–48 (2d Cir.1983) (in attorney's fee context, requiring "contemporaneous time records ... [that] specify, for each attorney, the date, the hours expended, and the nature of the work"). As a result, the Court will not hold Penn Plastics liable for auditors' fees or expenses based on the auditors' billing report.

However, Penn Plastics has itself acknowledged that a single auditor, one Mr. Wechsler, spent six hours at Penn Plastics' offices performing the audit. Moreover, based on a comparison of the auditors' billing report with the billing report submitted by the Trustees' counsel, the Court finds that another auditor, one Ms. Altman, spent approximately 1.5 hours discussing this action with the Trustees' counsel and that this is part of the "costs of the audit" recoverable in the event of litigation under Articles 19 and 19–A.[12] Thus, multiplying Mr. Wechsler's allowable time of 6 hours by his hourly rate yields a sum of $750. Multiplying Ms. Altman's allowable time of 1.5 hours by her hourly rate yields a sum of $277.50. The Trustees may recover these amounts as costs of the audit.

## VI. "A MINOR DISCREPANCY OF AN AMOUNT LESS THAN APPROXIMATELY $200"

It is with considerable displeasure that the Court takes up the final issue that the parties have raised for this Court's consideration. This issue is whether the Trustees' damages calculations do not account for an alleged overreporting by Penn Plastics of its contribution liability.

Among the affidavits that the Trustees submitted in support of their motion for summary judgment was that of Ms. Jan Altman, who is one of the two auditors referred to above. Ms. Altman stated in relevant part: "At the conclusion of the field audit, my colleague Mr. Wechsler [who conducted the field audit] noted that there was *a minor discrepancy of an amount less than approximately $200.*" Andrade Aff. at Exh. B, ¶ 1 (presenting Affidavit of Jan Altman); *see also* Andrade Aff. at ¶ 1 ("The audit confirmed that Penn Plastics had, in essence, *not under reported* the number of employees covered by pension trust fund and health and welfare fund contributions.") (emphasis added). These representations on the Trustees' behalf acknowledge a discrepancy, however small, without ruling out the possibility that it was an overreporting by Penn Plastics.

For its part, Penn Plastics submitted among its opposition papers the affidavit of Mr. Mark Lasser, a Penn Plastics' Vice President. Mr. Lasser stated:

The audit did not reveal any substantial discrepancy between the amounts due as reported ... and the amounts found to be due in the books and records of Penn Plastics. On the contrary, the auditor orally advised Penn Plastics that Penn Plastics had over-reported amounts due the Funds.

Lasser Aff. at ¶ 9.[13] Moreover, in its memorandum of law in opposition to summary judgment, Penn Plastics argued that summary judgment could not be entered against it, at least as to the amount of damages, because there was a genuine issue of material fact as to whether the Trustees' calcula-

12. Based on the auditor's invoice, the hourly rate for Mr. Wechsler's services is $125, and the hourly rate for Ms. Altman's services is $185. Penn Plastics did not dispute the reasonableness of these rates. *See* Defendant's Rule 3(g) Statement at ¶¶ 4–5.

13. Mr. Lasser did not state specifically the timing or amount of the alleged overreporting, except to acknowledge that it was not "substantial." *Id.*

tions of delinquent contributions and interest owed reflected the alleged overreporting.

Finally, in their reply papers, the Trustees did not dispute Mr. Lasser's assertion concerning an overreporting, nor did they acknowledge the amount and timing of any alleged overreporting so that the point would be taken out of dispute.[14]

The Court is not quick to infer bad faith and does not find bad faith on this record. However, the Court must wonder whether, in failing to respond to the substance of Penn Plastics' allegation, the Trustees' counsel and affiants believed that the Court would be willing to ignore what amounts to an allegation that the Trustees are consciously attempting to use this Court's powers to recover from Penn Plastics an amount greater than Penn Plastics is legally obligated to pay. *Compare* Rule 56(g) (authorizing contempt charges against attorneys and parties for affidavits made in bad faith). On the other hand, the Court must wonder whether Penn Plastics' decision to dispute what it acknowledges is not a "substantial" sum was directed principally toward delaying an inevitable judgment against it. *Compare id.* (authorizing contempt charges against attorneys and parties for affidavits made solely for the purpose of delay).

In any event, the Court will not enter summary judgment against Penn Plastics as to damages on the present record. *See* Rule 56(d) (providing, *inter alia,* for summary judgment as to liability but not damages). The Court strongly hopes that, after considering this Order, the parties will settle this litigation. However, if they do not, within fifteen (15) days of the date of this Order, the Trustees should submit to this Court a letter-brief no more than two (2) pages long, accompanied by one or more affidavits made on personal knowledge, which represent specifically the amount and timing of any overreporting of Penn Plastics' contribution obligations. Accompanying this letter-brief should be a proposed form of judgment, and one or more exhibits, prepared in accordance with the relevant portions of the Court's opinion, setting forth: (1) a detailed presentation of the amount and timing of Penn Plastics' delinquent contributions and payments toward its outstanding balance, and a detailed presentation of the interest charges owing on the delinquent contributions (including prejudgment and penalty interest);[15] (2) attorney's fees and costs;[16] and (3) auditors fees. Within twenty-five (25) days of the date of this Order, Penn Plastics may submit a letter-brief in reply, accompanied only if necessary by affidavits and exhibits. The scope of Penn Plastics' letter-brief in reply shall be limited to disputing the mathematical accuracy of the calculations that are embodied in the Trustees' presentation of damages, because upon the Court's receipt of the Trustees' letter-brief and attachments, no

---

**14.** To the extent that the statement in the Trustees' reply concerning the inadmissibility of hearsay evidence was intended as a response to Mr. Lasser's assertion, this only heightened the Court's displeasure, because it did nothing to refute or admit the truth of the matter asserted. However, to answer the Trustees' point, the Court finds that the auditor who allegedly admitted the overreporting may properly be considered an agent of the Trustees for purposes of Rule 801(d)(2) (admission of agent admissible nonhearsay) of the Federal Rules of Evidence. In any event, the Court finds that the auditor's alleged concession has sufficient circumstantial guarantees of trustworthiness that it should be admitted under Rule 803(24) (catch-all exception where declarant available). The Court finds this conclusion supported by: (1) the fact that the statement at issue may be admissible under another exception or exclusion to the hearsay rule; and (2) the fact that other admissible evidence tends to corroborate, rather than refute, the truth of the matter asserted. *Cf. In re Columbia Securities Litigation,* 155 F.R.D. 466, 474–79 (S.D.N.Y.1994) (Sand, J.) (admitting evidence in opposition to summary judgment under Rule 803(24)).

**15.** Needless to say, the exhibits should properly reflect the timing and amount of any alleged overreporting. Moreover, as to form, the Court has in mind a presentation of the sort presented in Exhibit A to the Trustees' Reply Memorandum of Law. The Court requests, however, that the exhibit ultimately submitted also include the number of employees and the contribution rate per employee for each of the Funds.

**16.** Penn Plastics did not dispute the amount of "costs" that the Trustees claimed pursuant to § 1132(g).

genuine issues of material fact will remain in dispute.[17]

Counsel and the parties are hereby fore-warned that this Court will not tolerate dilatory tactics or conduct undertaken in less than the utmost good faith. *Compare* Rule 56(g).

### CONCLUSION

For the foregoing reasons, the Trustees' motion for summary judgment against Penn Plastics is granted as to liability for some amounts of delinquent contributions, pre-judgment and penalty interest, attorney's fees and costs, and auditor's fees. However, the Trustees' motion for summary judgment against Penn Plastics is denied concerning the amount of the Trustees' damages. The parties should attempt to settle this matter in light of the Court's opinion. Failing a settlement, the Trustees should submit a letter-brief and a proposed form of judgment within fifteen (15) days of this Order, as detailed above. Penn Plastics may submit a letter-brief in reply within twenty-five (25) days of this Order, as detailed above.

**SO ORDERED.**

---

17. The scope of the affidavit(s) that Penn Plastics submits, if any, shall be limited to disputing the amount or timing of Penn Plastics' alleged overreporting. However, the Court does not expect that either Mr. Lasser or anyone else at Penn Plastics is aware of the auditor's specific finding concerning the timing or amount of the alleged overreporting. For if someone at Penn Plastics was aware of these points, the Court would have expected this information to have been the subject of an affidavit in opposition to the Trustees' amended motion for summary judgment so that the matter could have been disposed of in this Order, without further attention from this Court. This analysis assumes, of course, that Penn Plastics' omission to submit this information previously was not committed solely for the purpose of delay. *Compare* Rule 56(g).