Arthur FISHBEIN, James Crowley, Janet Sachs, Herbert Pobiner, Louis Flacks, Paul Berkman, and Leon Silverman, as Trustees of the Union Mutual Medical Fund, and Union Mutual Medical Fund, Plaintiffs,

v.

George MIRANDA, Charles Hall, Sr., Martin Keane, Martin Sheer, and Thomas Mackell, Jr., in their capacities as trustees of the Allied Welfare Fund, Allied Welfare Fund, George Miranda, Robert Bellach, Anthony Cerbone, Martin Sheer, and John Does

1–6 in their capacities as Trustees of Teamsters Local 210 Affiliated Health and Insurance Fund, Teamster Local 210 Affiliated Health and Insurance Fund, And Crossroads Healthcare Management, LLC., Defendants.

No. 06 Civ. 13222(BSJ)(GWG).

United States District Court, S.D. New York.

April 12, 2011.

377

**Memorandum and Order**

BARBARA S. JONES, District Judge.

This case arises out of a set of collective bargaining agreements ("CBAs") pursuant to which Defendants Teamsters Local 210 Affiliated Health and Insurance Fund ("Local 210 Fund") and the Allied Welfare Fund ("AWF") collect contributions from employers and then remit a portion of those contributions to Plaintiff Union Mutual Medical Fund ("UMMF"). Plaintiffs allege the Local 210 Fund and AWF failed to properly remit employer contributions to UMMF. Plaintiffs also allege their administrator and manager, Defendant Crossroads Healthcare Management, LLC ("Crossroads"), participated directly in the scheme to deprive UMMF of its funding and helped the Local 210 Fund establish a fund that competes directly with UMMF.

There are two motions before the Court. First, Plaintiffs Leon Silverman, James Crowley, Janet Sachs, Herbert Pobiner, Louis Flacks and Paul Berkman, as Trustees of UMMF ("UMMF trustees"), and UMMF (collectively, "Plaintiffs") move for partial summary judgment on their first, second, fourth, fifth, and sixth counts, and for summary judgment on all of Crossroads' counterclaims. Defendant Local 210 Fund moves, in turn, for summary judgment on Plaintiffs' second count. For the reasons provided below, Plaintiffs' motion for partial summary judgment is GRANTED in part and DENIED in part, and the Local 210 Fund's motion for summary judgment is DENIED.

## BACKGROUND

### A. UMMF

Plaintiff UMMF is a health plan governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* (Pl.'s 56.1 Stmt. ¶ 1.) Its participants and beneficiaries consist primarily of retired members (and their spouses) of two unions: (1) the Allied Trades Council ("ATC"), Division Local 338, Retail, Wholesale and Department Store Union–United Food and Commercial Workers, AFL–CIO, and (2) the International Brotherhood of Teamsters Local Union 210 ("Local 210 union" and together with ATC, "unions").[1] (*Id.* ¶ 2.)

1. The Local 210 union merged with and suc- ceeded the International Brotherhood of

## B. AWF

AWF, who was voluntarily dismissed from this action (Dkt.138, 160), is a multi-employer, collectively bargained employee welfare benefit plan under ERISA that provides benefits, primarily, to active union workers. (*Id.* ¶ 9.) It was established by the unions and funded by contributing employers. (*Id.*) In 2006, it was "bifurcated," and a portion of its assets were transferred to the Local 210 Fund. (*Id.* ¶ 10.) After the bifurcation, most of the contributing employers who previously contributed to AWF contributed to the Local 210 Fund. (*Id.* ¶ 11.)

## C. Local 210 Fund

Defendant Local 210 Fund is also an employee welfare benefit plan under ERISA. (*Id.* ¶ 13.) It was established to provide health insurance for members of the Local 210 union (and their spouses) (*id.*) and is funded by contributions from employers who are parties to CBAs with the Local 210 union (*id.* ¶ 15). After AWF was bifurcated, the Local 210 Fund succeeded AWF under most of the CBAs. (*Id.* ¶ 16.)

## D. Crossroads

Crossroads is a third-party administrator and health care management company, who provided services to UMMF, in 2005 and 2006, pursuant to an assigned services agreement from Churchill Benefit Services ("Churchill"). (*Id.* ¶ 17; Crossroads' Counter 56.1 Stmt. ¶ 18.) One of Crossroads' duties was to ensure UMMF received monies it was entitled to under the CBAs at issue. (Pl.'s 56.1 Stmt. ¶ 22; Crossroads' Counter 56.1 Stmt. ¶ 22.) Crossroads also served as the third-party

administrator for both AWF and the Local 210 Fund. (Pl.'s 56.1 Stmt. ¶ 26.)

## E. Collective Bargaining Agreements

Prior to being amended in March or April 2006, the CBAs, all of which contained nearly identical language, provided:

> It is hereby agreed ... the Employer shall pay to the Allied Welfare Fund the sum of Fifty–Nine ($59.00) Dollars, each and every week for each employee who is employed within the bargaining unit . . . .

> . . .

> From and out of the contributions made to the Allied Welfare Fund as specified above, Eight Dollars per employee per week shall be unconditionally and irrevocably allocated and paid to the Union Mutual Medical Fund ... for the benefit of retired employees of the Employer and retired employees of all other employers similarly situated and their families . . . .

(Kipnees Decl. Ex. J, at 8–9.)

## F. Duane Reade Settlement

In 2000, AWF's trustees filed suit against Duane Reade,[2] a contributing employer that had a CBA with the unions, claiming Duane Reade failed to make required CBA payments. (Pl.'s 56.1 Stmt. ¶ 30.) Duane Reade and AWF settled their dispute in 2006 for $825,000.00. (Pl.'s 56.1 Stmt. ¶¶ 31–32.) The Local 210 Fund does not deny these funds were received in satisfaction of Duane Reade's obligation to pay contributions to AWF. (Local 210 Fund's Counter 56.1 Stmt. ¶ 33;

---

Teamsters Local Union 815, whose retiring employees also participated in UMMF. (Pl.'s 56.1 Stmt. ¶ 3.)

**2.** Duane Reade refers to Duane Reade, Inc., Duane Reade, and DRI I, Inc. (Pl.'s 56.1 Stmt. ¶ 28.)

*see also* Pl.'s 56.1 Stmt. ¶ 33.) In addition, although the Local 210 Fund denies AWF transferred all of the settlement money to it after AWF's bifurcation, it does not deny UMMF received no money from the settlement.[3] (Local 210 Fund's Counter 56.1 Stmt. ¶ 34.) Crossroads handled the settlement money. (Pl.'s 56.1 Stmt. ¶ 35.)

Based on the CBA terms provided above, UMMF alleges it should have received $8.00 out of every $59.00 AWF received pursuant to the Duane Reade settlement. Because it did not, UMMF claims it was wrongfully denied money it is entitled to under the Duane Reade CBA.

### G. CBA Amendments

In 2005, George Miranda, then a trustee of AWF and president of the Local 210 union, sought to merge UMMF into AWF.[4] (Pl.'s 56.1 Stmt. ¶ 36.) These efforts were ultimately unsuccessful. (*Id.* ¶ 37; *see also* Local 210 Fund's Counter 56.1 Stmt. ¶ 37.) UMMF alleges that in retaliation— an allegation the Local 210 Fund and Crossroads deny—beginning in January 2006, the Local 210 union began attempting to persuade contributing employers to revise their CBAs to reduce the amount remitted to UMMF. (Pl.'s 56.1 Stmt. ¶ 38; Local 210 Fund's Counter 56.1 Stmt. ¶ 38; Crossroads' Counter 56.1 Stmt. ¶ 38.) Shortly thereafter, in March or April 2006, the CBAs were amended. (Pl.'s 56.1 Stmt. ¶ 41.) Under the terms of the amended CBAs, the amount AWF and the Local 210 Fund remitted to UMMF was reduced from $8.00 per employee per week to $0.10 per employee per week. (*Id.* ¶ 39; Local

210 Fund's Counter 56.1 Stmt. ¶ 39; Crossroads' Counter 56.1 Stmt. ¶ 39.) The balance remained with AWF or the Local 210 Fund. (Pl.'s 56.1 Stmt. ¶ 40; Local 210 Fund's Counter 56.1 Stmt. ¶ 40.[5])

In the first three months of 2006, UMMF received between $74,000.00 and $59,000.00 pursuant to the CBAs. (Pl.'s 56.1 Stmt. ¶ 42.) After the CBAs were amended, UMMF received approximately $1,220.00 in April, $994.00 in May, $806.00 in June, $633.00 in July, $661.00 in August, $685.00 in September, $442.00 in October, $643.00 in November, $343.00 in December, and $449.00 in January 2007. (*Id.* ¶ 43.)

### H. Local 210 Retiree Fund

UMMF alleges that at the same time the Local 210 union was working to deprive UMMF of its CBA contributions, the Local 210 union began setting up a competing fund, the Teamsters Local 210 Affiliated Health and Insurance Fund Retiree Group Health Plan ("Local 210 Retiree Fund"). In support of this argument, UMMF submits a facsimile, which appears to have been sent on August 31, 2006, from the executive board of the Local 210 union and the Board of Trustees for Teamsters Local 210 Affiliated Health and Insurance Fund to all Local 815 and Local 210 retirees participating in UMMF. (Kipnees Decl. Ex. B, at Ex. B.) The facsimile claims that as of September 1, 2006, all current and future retirees of Local 815 and Local 210 participating in UMMF (and their spouses who are at least 62 years old) would be

---

**3.** Crossroads, by contrast, claims it was informed AWF paid money to UMMF as part of the Duane Reade settlement and in connection with this action. (Crossroads' Counter 56.1 Stmt. ¶ 34.)

**4.** Miranda is currently the Secretary–Treasurer and Principal Executive Officer of the Lo-

cal 210 union. (Miranda Decl. in Support of the Local 210 Fund's Mot. for Summ. J. ¶ 1.)

**5.** Crossroads takes the slightly different position "that any monies not passed through to the UMMF were allocated to the various funds according to the terms of the CBAs." (Crossroads' Counter 56.1 Stmt. ¶ 40.)

covered under the Local 210 Retiree Fund, free of charge and without having to pay a membership fee. (*Id.*) The facsimile also asks recipients to complete an enclosed form, which is not included in the materials provided to the Court. (*Id.*) The materials do include, however, a "Summary Plan Description." (*Id.* Ex. B, at Ex. C.) Crossroads admits and the Local 210 Fund does not admit or deny that the Local 210 Retiree Fund is under the umbrella of the Local 210 Fund and is funded with money from contributing employers under the CBAs. (Crossroads' Counter 56.1 Stmt. ¶ 45; Local 210 Fund's Counter 56.1 Stmt. ¶ 45.)

## I. UMMF's Claims Against Crossroads

On March 10, 2006, UMMF gave Crossroads a six-months' termination notice.[6] (Pl.'s 56.1 Stmt. ¶ 47.) UMMF claims Crossroads was aware, as early as April 2006, that the Local 210 union was seeking to amend the CBAs to reduce amounts owed to UMMF. (*Id.* ¶ 49.) Crossroads denies this allegation, but admits it learned "at some point" the Local 210 union was negotiating with employers to amend the CBAs. (Crossroads' Counter 56.1 Stmt. ¶ 49.) Crossroads also admits it made no inquiry into why the Local 210 union sought the changes. (*Id.* ¶ 50.) It notes, however, that as a third-party administrator whO was not a party to the CBAs, it had no standing or authority to question amendments to the CBAs. (*Id.*) Crossroads claims the UMMF trustees were notified by their own attorneys, prior to the amendments, that the Local 210 union could reduce or terminate UMMF's funding.[7] (*Id.* ¶ 51.) Crossroads also denies it

followed directions from the Local 210 union to reduce UMMF's weekly allocation per employee from $8.00 to $0.10, instead arguing it followed the terms of the amended CBAs. (*Id.* ¶ 52.)

At Miranda's deposition, when asked about Crossroads' involvement in the formation of the Local 210 Retiree Fund, he stated, Crossroads "helped draft the plan indenture, the trust agreement, in terms of including the retiree portion." (Kipnees Decl. Ex. E, at 284:9–17.) Crossroads denies helping set up a competing fund, but concedes it provided "similar services to other funds." (Crossroads' Counter 56.1 Stmt. ¶ 53.) Moreover, although Crossroads denies coordinating the mailing of the Local 210 Fund's solicitation to UMMF participants (*id.* ¶ 54), the August 31, 2006 facsimile discussed above asks recipients to send completed forms to the care of Crossroads. (Kipnees Decl. Ex. B, at Ex. B.) It also instructs recipients to call Crossroads with any questions (*Id.*) Crossroads admits handling numerous inquiry calls from retirees. (Crossroads' Counter 56.1 Stmt. ¶ 55.)

In addition to the allegations above, UMMF claims Crossroads failed to properly perform its administrative obligations. In support of these allegations, UMMF submits a declaration from Robert Lichterman, the President of Synotnic Systems, Inc. ("Synotnic"), the administrator who replaced Crossroads. (Lichterman Decl. ¶¶ 1–2.) He claims that in the summer of 2006, Crossroads repeatedly and consistently ignored or refused Synotnic's requests for claims data, which was necessary for Synotnic to assume its duties. (*Id.* ¶¶ 3–4.) It was not until September

---

**6.** Under the terms of the notice, the termination would become effective September 10, 2006. (Pl.'s 56.1 Stmt. ¶ 47.)

**7.** The deposition page Crossroads cites in support of this claim is not included in the materials provided to the Court. (Acevedo Decl. Ex. A, at 173.)

12, 2006, according to Lichterman, Crossroads turned over some of the necessary data. (*Id.* ¶ 5.) After Crossroads was terminated on September 10, 2006, Lichterman claims Synotnic learned Crossroads failed to process approximately 447 claims, dating back to mid–2005. (*Id.* ¶ 6.)

Crossroads denies all of the transition allegations. (Crossroads' Counter 56.1 Stmt. ¶¶ 56–59.) It submits a declaration from Patrick Paolucci, Executive Vice President of Crossroads. (Paolucci Decl. ¶ 1.) He claims that during the transition process, Crossroads' representatives were in contact with Synotnic regarding the transfer of records and other matters. (*Id.* ¶ 6.) He also claims Crossroads did not fail to process 447 claims, and that no more than 25 claims were pending at the time of the transfer. (*Id.* ¶ 7.)

### J. First Amended Complaint and Crossroads' Counterclaims

The First Amended Complaint asserts six counts. The first is a demand for an accounting, from all Defendants, for monies received pursuant to the Duane Reade settlement. (First Am. Compl. ¶¶ 43–46.) The second is a demand for an accounting, from all Defendants, for all monies received pursuant to CBAs, in which UMMF is named, from January 1, 2005 to the date of judgment.[8] (*Id.* ¶¶ 47–50.) The third is that the AWF trustees and the Local 210 Fund trustees failed to properly remit employer contributions to UMMF. (*Id.* ¶¶ 51–53.) The fourth is that Crossroads breached its fiduciary duty in violation of ERISA. (*Id.* ¶¶ 54–57.) The fifth is that Crossroads engaged in prohibited transactions

in violation of ERISA. (*Id.* ¶¶ 58–60.) The final count is that Crossroads committed breach of contract. (*Id.* ¶¶ 61–63.)

In its answer, Crossroads asserts four counterclaims. The first is for breach of contract. (Crossroads' Answer and Countercl. ¶¶ 70–80.) The second is for defamation against certain UMMF trustees, in their capacity as individuals. (*Id.* ¶¶ 81–88.) The third is for contractual indemnification of attorneys' fees associated with defending this action. (*Id.* ¶¶ 89–94.) The last count is for quantum meruit. (*Id.* ¶¶ 95–97.)

### K. Prior Relevant Rulings

On November 16, 2009, 670 F.Supp.2d 264 (S.D.N.Y.2009), the Court denied the Local 210 Fund's motion to dismiss Plaintiffs' first and second counts, but dismissed the third count.[9] (Dkt.100.) With respect to the first two counts, the Court found that the CBAs, including Duane Reade's, could be enforced against Defendants AWF and the Local 210 Fund, although neither is a party to the CBAs, because Plaintiffs adequately alleged AWF and the Local 210 Fund accepted their obligations to remit monies to UMMF under the CBAs and because the circumstances indicate both intended to be bound by the CBAs. (*Id.*, at 273–74.) The Court also found Plaintiffs have standing to sue under the CBAs and to demand a portion of the Duane Reade settlement because they adequately alleged UMMF is an intended third-party beneficiary under the CBAs. (*Id.*, at 275–76.) In regard to Plaintiffs' requests for an accounting, restitution, and

---

**8.** In the second count, Plaintiffs refer to the "Local 210 Plan Trustees." (First Am. Compl. ¶ 50.) It is unclear whom Plaintiffs are referring to because this is the only section of the First Amended Complaint that refers to the "Local 210 Plan Trustees." (*See* First Am. Compl. ¶¶ 47–50.) Plaintiffs are,

presumably, referring to the Local 210 Fund trustees, whom Plaintiffs specifically demand judgment from. (*Id.*)

**9.** The Court later denied the Local 210 Fund's motion for reconsideration. (Dkt.117.)

an award of interest, the Court found these remedies are cognizable because they constitute "equitable relief" under ERISA § 502(a)(3)(B), 29 U.S.C. § 1132(a)(3)(B).[10] (*Id.*, at 276–77.)

With respect to the third count—that AWF and the Local 210 Fund failed to remit contributions in violation of ERISA § 515, 29 U.S.C. § 1145—the Court dismissed this count because neither AWF nor the Local 210 Fund are "employers" under ERISA § 515. (*Id.*, at 278–78.)

In a separate order, dated April 16, 2010, the Court denied then-Defendant AWF's motion to dismiss Plaintiffs' first and second counts, but dismissed the third count. (Dkt.118.) The Court extended all of the findings from the November 16, 2009 Order to AWF. (*Id.*, at 7.) It also found Plaintiffs have "fiduciary" standing under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) (*id.*, at 9–12), but not "participant or beneficiary" standing under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) (*id.*, at 12–13).

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Although all reasonable inferences and ambiguities must be drawn or resolved in favor of the nonmoving party, " '[u]nless the nonmoving party offers some hard evidence showing that its version of the events is not wholly fanciful, summary judgment is granted to the mov-

---

**10.** The Court also found it has subject matter jurisdiction over the action under ERISA.

ing party.' " *See, e.g., Miner v. Clinton County, New York*, 541 F.3d 464, 471 (2d Cir.2008) (alteration in original) (citation omitted).

## ANALYSIS

### I. Counts 1 and 2

Plaintiffs' first count is a demand for an accounting of money received from the 2006 Duane Reade settlement and a judgment ordering the Local 210 Fund and Crossroads to remit $8.30 for every $59.00 AWF and the Local 210 Fund received pursuant to the settlement agreement. (First Am. Compl. ¶¶ 43–46.) The second count is a demand for an accounting of all monies received from CBAs, in which UMMF is named, from January 1, 2005 to the date of judgment and a judgment ordering the Local 210 Fund and Crossroads to remit all monies owed to UMMF under those CBAs. (*Id.* ¶¶ 47–50.)

■ The Court begins with the Local 210 Fund's argument that the Court lacks subject matter jurisdiction over Plaintiffs' first two counts. Plaintiffs bring these counts, both of which are based solely on alleged violations of the CBAs, under ERISA § 502(a)(3)(B), 29 U.S.C. § 1132(a)(3)(B). This section provides that a fiduciary may bring a civil action "to obtain ... appropriate equitable relief" to redress ERISA violations or "to enforce any provisions of ... the terms of [a] plan." 29 U.S.C. § 1132(a)(3)(B). To the extent the Local 210 Fund argues a CBA cannot be a "plan" under Section 502(a)(3)(b), they are wrong.

Under ERISA, a "plan" includes,
any plan, fund, or program which was ... or is ... established or maintained

(Dkt. 100, at 26.)

by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries ... medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits.

29 U.S.C. § 1002(1); *see also id.* § 1002(3). Here, pursuant to the terms of each CBA, nearly all of which contain identical operative language, "an employer" (*i.e.,* each contributing employer) and "an employee organization" (*i.e.,* the unions) "established" a plan to provide "insurance, welfare, Major Medical insurance and similar benefits for" retired employees of the unions. (*See, e.g.,* Kipnees Decl. Ex. G, at ACTAVIS 541.) The UMMF trust indenture, which all remittances are subject to, reiterates that UMMF was established to provide "life insurance, death and accident insurance, hospitalization, surgical benefits, medical, geriatric and dental care, and such other advantages, care, and benefits" for the retired employees of the unions. (*Id.,* Ex. A, at UMMF 3117.) Although not every CBA qualifies as a "plan" under ERISA § 502(a)(3)(B), in view of the plain language of the CBAs at issue here and the UMMF indenture, Plaintiffs' action to enforce the CBAs is an action to enforce "the terms of [a] plan." 29 U.S.C. § 1132(a)(3)(B).

To the extent the Local 210 Fund argues an alleged violation of a CBA by any person who is not an "employer" cannot constitute a violation of ERISA or "the terms of [a] plan" under ERISA § 502(a)(3)(B),[11] the Local 210 Fund cites no authority in support of this claim. In addition, nothing in the text of ERISA § 502(a)(3)(B) supports such a limitation. Accordingly, the Court declines to read this limitation into ERISA § 502(a)(3)(B).

■ Finding subject matter jurisdiction, the Court returns to an issue it already decided—namely, that Plaintiffs have standing to enforce the CBAs and seek an accounting of monies received pursuant to the Duane Reade settlement because UMMF is an expressly named third-party beneficiary in the CBAs, including the one with Duane Reade. *See also Benson v. Brower's Moving & Storage, Inc.,* 907 F.2d 310, 313 (2d Cir.1990) (finding fund trustees had standing because "[t]he Funds occupy the position of a third party beneficiary of the collective bargaining agreement between" the employer and the union) (citation omitted). In its motion for summary judgment and in opposition to Plaintiffs' motion for summary judgment, the Local 210 Fund largely rehashes arguments the Court already considered and rejected three times.[12] (*See* Dkt. 100, 117, 118.) Because the Court's earlier finding was a legal determination, based on the express terms of the CBAs, there is no need to revisit this issue again. Plaintiffs

---

**11.** The Court dismissed Plaintiffs' third count for violation of ERISA § 515, 29 U.S.C. § 1145, on the basis that the Local 210 Fund is not an "employer." (Dkt. 100, at 21–25.)

**12.** The Local 210 Fund cites Illustration 3 from Comment B in the Restatement (Second) of Contracts § 302, along with a Second Circuit decision applying Illustration 3, *see In re: Publishers Consortium, Inc.,* 345 Fed. Appx. 710 (2d Cir.2009), in support of its argument that UMMF is an incidental benefi-

ciary. Both the Illustration and the Second Circuit's decision, however, involve situations concerning a debt. *Restatement 2d of Contracts § 302* Illustration 3 (1981) ("[p]romise to pay the promisee's debt"); *see also In re: Publishers Consortium, Inc.,* 345 Fed.Appx. at 711. This case does not concern a debt. Accordingly, neither the Illustration nor the Second Circuit's decision has any bearing on this case.

are a third-party beneficiary under the terms of the CBAs. (Dkt.100, 117, 118.)

As a third-party beneficiary, the CBAs could not be amended without UMMF's consent. In *Trustees of the Four Joint Boards Health and Welfare and Pension Funds v. Penn Plastics, Inc.*, a court in this district explained that "a promisor and promisee are not free to modify or discharge the promisor's duty to an intended third-party beneficiary of the contract after the beneficiary's rights have vested." 864 F.Supp. 342, 347 n. 6 (S.D.N.Y.1994) (citation omitted). The court went on to find that because the funds at issue there were "intended third-party beneficiaries of the Collective Bargaining Agreement" and did not consent to the CBA amendment, "the [a]mendment ... is ineffective as against the Funds." *Id.* There is no disputed issue of material fact that UMMF did not consent to the amendments at issue here.

There is also no disputed issue of material fact regarding UMMF's remittals after the CBAs were amended. First, with respect to the $825,000.00 from the Duane Reade settlement, although these funds were received in satisfaction of Duane Reade's obligation to pay contributions to AWF (Local 210 Fund's Counter 56.1 Stmt. ¶ 33; *see also* Pl.'s 56.1 Stmt. ¶ 33), none of this money was remitted to UMMF (Local 210 Fund's Counter 56.1 Stmt. ¶ 34).[13] Second, with respect to general employer contributions, after the CBAs were amended, the amount UMMF received decreased sharply from between $74,000.00 and $59,000.00 in the first three months of 2006 to $449.00 in January 2007. (Pl.'s 56.1 Stmt. ¶¶ 42–43.)

The Court made two additional important findings in the November 16, 2009 Order. First, it found Plaintiffs may enforce the CBAs against the Local 210 Fund because it accepted the CBAs and acted upon them. (Dkt. 100, at 10–15); *see Argo Marine Sys., Inc. v. Camar Corp.*, 755 F.2d 1006, 1010–11 (2d Cir.1985) (explaining that courts have enforced contracts against non-signatories "where the non-signing party 'has accepted [the] written agreement and has acted upon it' ") (alteration in original) (citations omitted). Second, it found the relief Plaintiffs seek on their first two counts—an accounting, restitution, and interest—constitute "other" forms of "appropriate equitable relief" under ERISA § 502(a)(3)(B), 29 U.S.C. § 1132(a)(3)(B). (*Id.*, at 19–21.)

In light of the Court's legal findings and the lack of any disputed issues of material fact regarding Plaintiffs' first two counts, Plaintiffs are entitled to summary judgment on both counts. The Local 210 Fund must provide: (1) an accounting of all proceeds received from the Duane Reade settlement and (2) an accounting of all monies received from contributing employers from January 1, 2005 to the present. To the extent the Local 210 Fund makes arguments regarding potential remedies, these arguments are premature. The parties will have ample opportunity to address the amount of any restitution after discovery on this issue is complete.[14]

---

**13.** Although Crossroads denies this material fact, it fails to create a disputed issue of material fact because it offers only the conclusory allegation that it was informed AWF paid money to UMMF as part of the Duane Reade settlement and in connection with this action. (Crossroads' Counter 56.1 Stmt. ¶ 34.) In order to establish the existence of a disputed issue of material fact, " 'the nonmoving party [must] offer[ ] some hard evidence showing that its version of the events is not wholly fanciful.' " *See Miner*, 541 F.3d at 471 (citation omitted). Crossroads has not done that here.

**14.** To date, discovery has focused on whether Plaintiffs are entitled to an accounting and restitution, as a matter of liability.

Crossroads does not oppose Plaintiffs' motion for summary judgment on their first two counts. It admits, however, it kept copies of accounting reports, 5500 forms, and other financial documents prepared by outside professionals retained by UMMF. (Crossroads' Counter 56.1 Stmt. ¶ 27.) It also admits it kept track of contributions from contributing employers. (*Id.*) Because Crossroads has financial records that may reveal the amount of restitution Plaintiffs are entitled to from the Local 210 Fund, Crossroads must provide: (1) an accounting of all proceeds received from the Duane Reade settlement and (2) an accounting of all monies received from contributing employers from January 1, 2005 to the present.

■ To be clear, however, unlike the Local 210 Fund, Crossroads had no role or responsibilities under the CBAs. Accordingly, it could not accept the CBAs or act upon them. *Cf. Argo Marine Sys.,* 755 F.2d at 1010–11 (explaining courts have enforced contracts against non-signatories "where the non-signing party 'has accepted [the] written agreement and has acted upon it'") (alteration in original) (citations omitted). Thus, while Crossroads must take part in the accounting, Plaintiffs are not entitled to restitution from Crossroads on their first two counts.

## II. Counts 4 and 5—Breach of Fiduciary Duty

Plaintiffs' fourth and fifth counts hinge on whether Crossroads was a fiduciary under ERISA. The fourth count alleges Crossroads breached its fiduciary duty by, among other things, diverting monies properly allocated to UMMF and helping set up the Local 210 Retiree Fund.[15] (First

Am. Compl. ¶¶ 54–57.) Plaintiffs rely on the same allegations in support of their fifth count—that Crossroads engaged in prohibited transactions.[16] (*Id.* ¶¶ 58–60.)

■ In every case alleging breach of an ERISA fiduciary duty the " 'threshold question ... is ... whether that person was acting as a fiduciary (that is, performing a fiduciary function) when taking the action subject to complaint.' " *See, e.g., In re SLM Corp. ERISA Litig.,* No. 08 Civ. 4334(WHP), 2010 WL 3910566, at *6 (S.D.N.Y. Sept. 24, 2010) (citations omitted). Under ERISA, a person is a fiduciary "to the extent":

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). In *Harris Trust and Savings Bank v. John Hancock Mutual Life Insurance Company,* the Second Circuit explained, "a person may be an ERISA fiduciary with respect to certain matters but not others, for he has that status to the extent he has or exercises the described authority or responsibility." 302 F.3d 18, 28 (2d Cir.2002) (citations and internal quotation marks omitted).

According to the parties' services agreement, "[t]he [UMMF] Trustees ... engage[d] [Crossroads] to act as Administra-

---

**15.** The fourth count is brought under ERISA § 404(a) and 409(a), 29 U.S.C. §§ 1104(a) and 1109(a). (First Am. Compl. ¶¶ 54–57.)

**16.** The fifth count is brought under ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2). (*Id.* ¶¶ 58–60.)

tor and Manager of all of the affairs of the Trust Fund." (Kipnees Decl. Ex. I ¶ 1.) Under the agreement, Crossroads' duties included, among other things:

(1) all employer billing services;

(2) clerical services arising out of the maintenance of books of account;

(3) all supervisory services over employees handling UMMF work;

(4) processing of all claims;

(5) all accounting, legal compliance and other professional services;

(6) all actuarial services;

(7) all public relations services;

(8) research and educational services;

(9) auditing of records of contributing employers to ascertain whether proper payments were made to UMMF;

(10) collection of all contributions due and owed to UMMF;

(11) "[a]dministration of the Investment Account in accordance with instructions and investment decisions of the Trustees";

(12) preparation of "all tax documents (e.g. IRS Form 990, Form 5500, Form 1099, Form 941, etc.)"; and

(13) development and maintenance of a computerized system to monitor billing of employers and payment of claims.

(*Id.*) The agreement also requires Crossroads "to have sufficient[ly] skilled, experienced personnel" to "advis[e] the Trustees and consult [ ] with them in regard to all matters concerning the affairs of the Trust Fund." (*Id.* ¶ 2.) Lastly, although not provided for in the services agreement, Michael DeBartolome, Crossroads' managing member and president, testified at his deposition that Crossroads had the authority to withdraw transfer funds from UMMF bank accounts and to draw checks on those accounts. (Kipnees Decl. Ex. F, at 136:16–23.)

In addition to the provisions regarding Crossroads duties, the agreement provides Crossroads' employment was "for the sole purpose of providing ministerial and administrative services in connection with the operation of the Fund." (Kipnees Decl. Ex. I ¶ 6.) It also provides, "the Trustees retain all final authority and responsibility for the Fund and its operation." (*Id.*) Finally, the agreement expressly disclaims Crossroads is a plan fiduciary. It states, Crossroads "is not authorized to act as a Plan Fiduciary nor authorized to act on behalf of the Board of Trustees in any discretionary manner." (*Id.*)

As an initial matter, because courts employ a functional analysis to determine whether a party is a fiduciary under ERISA, the disclaimer above "is not dispositive." *See Zang v. Paychex, Inc.,* 728 F.Supp.2d 261, 270 (W.D.N.Y.2010) (citation omitted). In other cases involving a determination of whether a party is a fiduciary under ERISA, courts have considered the Department of Labor's interpretative guidelines. *See* 29 C.F.R. § 2509.75–8; *see also Geller v. County Line Auto Sales, Inc.,* 86 F.3d 18, 21 (2d Cir.1996). The guidelines provide that "persons who have no power to make any decisions as to plan policy, interpretations, practices or procedures" and, thus, perform "purely ministerial functions" are not fiduciaries. 29 C.F.R. § 2509.75–8. Examples of "purely administrative functions" include:

(1) Application of rules determining eligibility for participation or benefits;

(2) Calculation of services and compensation credits for benefits;

(3) Preparation of employee communications material;

(4) Maintenance of participants' service and employment records;

(5) Preparation of reports required by government agencies;

(6) Calculation of benefits;

(7) Orientation of new participants and advising participants of their rights and options under the plan;

(8) Collection of contributions and application of contributions as provided in the plan;

(9) Preparation of reports concerning participants' benefits;

(10) Processing of claims; and

(11) Making recommendations to others for decision with respect to plan administration.

*Id.*

■ Here, most of Crossroads' contractual duties are similar to or encompassed by one or more of the "ministerial" examples provided in the interpretive guidelines. For example, Crossroads' duty to perform all accounting, legal compliance, and preparation of all tax documents is largely encompassed by the guidelines example regarding preparation of reports required by the government. Crossroads' duties to process claims and collected contributions are expressly provided for in the guidelines;[17] as is Crossroads' duty to have personnel who can advise UMMF's Trustees regarding UMMF's affairs. Crossroads' duty to develop and maintain a computerized system to monitor billing and payment of claims is similar to the guidelines example of maintaining participants' service and employment records. *See, e.g., New York State Teamsters Council Health & Hosp. Fund v. Centrus Pharmacy Solutions*, 235 F.Supp.2d 123, 124–28 (N.D.N.Y.2002) (finding, on motion to

dismiss, that plan manager was not an ERISA fiduciary because the tasks it performed under its service agreement were "virtually identical to those set forth in 29 C.F.R. [§ ] 2509.75–8") (citation omitted).

With respect to administering UMMF's Investment Account, Crossroads carried out this duty "in accordance with [the] instructions and investment decisions of the Trustees." (Kipnees Decl. Ex. I ¶ 1.) As a result, Crossroads' responsibilities in this area cannot be construed as anything but "ministerial." *See* 29 C.F.R. § 2509.75–8.

The only authority Crossroads had that arguably made it a fiduciary under ERISA was the ability to withdraw transfer funds from UMMF bank accounts and to draw checks on those accounts. (Kipnees Decl. Ex. F, at 136:16–23). This authority, arguably, provided Crossroads with a degree of "control respecting ... disposition of [UMMF's] assets." 29 U.S.C. § 1002(21)(A)(i). To the extent Crossroads had any control over UMMF's bank accounts, its fiduciary duties under ERISA were limited to this matter. *See NYSA–ILA Med. & Clinical Servs. Fund v. Catucci*, 60 F.Supp.2d 194, 201–02 (S.D.N.Y.1999) (explaining that "a person may be a fiduciary with respect to certain matters but not others, for he has that status only to the extent that he has or exercises the described authority or responsibility") (citations and internal quotation marks omitted). Because Plaintiffs proffer no evidence Crossroads engaged in any misconduct with respect to UMMF's bank accounts, to the extent Crossroads had an ERISA fiduciary duty to UMMF, that duty was not violated.[18]

---

17. Because Crossroads did not determine eligibility for retirees (DeBartolome Dep. 147:12–15) or decide appeals by retirees after a medical claim was denied (*id.* at 400:2–6), Crossroads' duty to process all claims fits squarely within the guidelines example of doing no more than applying rules to determine eligibility for participation or benefits.

18. Plaintiffs proffer no evidence in support of its allegation that Crossroads "enriched itself

One final point bears discussion. Plaintiffs claim Crossroads admitted it was a fiduciary under ERISA in response to a Request for Proposal ("RFP") issued by UMMF. Crossroads submitted its response in May 2006, after it had already received the six-months' termination notice. (First Am. Compl. Ex. A ¶ 14.) One question in the RFP asked: *"If retained,* do you agree that you are a fiduciary within the meaning of ERISA for purposes of administering the Fund?" (*Id.* (emphasis added).) Crossroads responded: "Our *existing* client contracts maintain fiduciary language and we acknowledge, for ERISA purposes, that we are a fiduciary." (*Id.* (emphasis added).) Because it was not retained, Crossroads argues it cannot be bound by its response.

The problem with Crossroads' argument is that its response was not conditional. To the contrary, it was a statement about the present and how it viewed the parties' relationship at that time. Crossroads' views, however, are nothing more than that. They are not binding on the Court. As explained above, a party is a fiduciary under ERISA if it performs "fiduciary function[s] when taking the action subject to complaint." *See In re SLM Corp. ERISA Litig.,* 2010 WL 3910566, at *6 (citations omitted). Here, that was not the case. Instead, with the exception of, apparently, some control over UMMF's bank accounts, Crossroads performed "purely ministerial functions." *See* 29 C.F.R. § 2509.75–8; *see also Centrus Pharmacy Solutions,* 235 F.Supp.2d at 124–28. Accordingly, Crossroads was not a fiduciary under ERISA with respect to the actions alleged in the fourth and fifth counts. These counts are therefore DISMISSED.

from UMMF assets by paying itself for the entire month of September 2006, when in fact its termination date was September 10, 2006." (First Am. Compl. ¶ 56.) Plaintiffs

## III. Count 6—Breach of Contract

Plaintiffs' final count alleges Crossroads breached the parties' services agreement. (First Am. Compl. ¶¶ 61–63.) The thrust of this claim is that Crossroads failed to properly collect contributions owed to UMMF, failed to process 447 claims, ignored its accounting responsibilities by failing to prepare financial statements for UMMF's 2005 fiscal year and not properly submitting 1099 data, and failed to provide timely claims data to UMMF's new third party administrator, Synotnic. (First Am. Compl. ¶¶ 61–63.)

First, with respect to the allegation Crossroads failed to properly collect contributions, the CBAs, not Crossroads, set the remittance amounts. (*See* Pl.'s 56.1 Stmt. ¶¶ 7, 39.) Until today's finding that the CBA amendments were invalid as to UMMF, *see supra* pp. 383–87, Crossroads was in no position to do anything regarding the reduced amounts that were remitted to UMMF pursuant to the amended CBAs. Because Crossroads could do nothing but collect the reduced amounts provided for under the terms of the amended CBAs, there is no basis for finding it failed to properly collect contributions owed to UMMF. Accordingly, Plaintiffs cannot state a claim for breach of contract on these grounds.

With respect to the allegation it failed to process 447 claims, Crossroads attempts to rebut this claim by submitting a declaration from Patrick Paolucci, Executive Vice President of Crossroads. According to Paolucci, no more than 25 claims were pending and waiting to be processed when Crossroads transferred its records to Synotnic. (Paolucci Decl. ¶ 7.) In view of

also do not repeat this allegation anywhere in their legal papers or Rule 56.1 statement of undisputed material facts.

these conflicting accounts, the Court finds there is a disputed issue of material fact regarding unprocessed claims.

Paolucci also attempts to rebut Plaintiffs' allegation that Crossroads failed to prepare UMMF's 2005 financial statements and did not properly submit 1099 data. Despite the terms in the services agreement providing that Crossroads shall "[p]repare all tax documents (e.g. IRS Form 990, Form 5500, Form 1099, Form 941, etc.) and assist the Trustees in filing them[,]" (Kipnees Decl. Ex. I ¶ 1), Paolucci contends "Crossroads did not prepare any 5500 financial disclosure forms or submit any tax data to the IRS" (Paolucci Decl. ¶ 8). According to Paolucci, "UMMF always used an outside accounting firm, Newman & Cohen, that it retained to prepare the 5500 forms and submit any required data to the IRS." (*Id.*) In view of Paolucci's claims, there is a disputed issue of material fact regarding whether Crossroads ignored its contractual accounting responsibilities, as Plaintiffs allege.

Lastly, Paolucci points the finger at Synotnic for any problems that occurred during the transition. Paolucci claims "Synotnic refused to assist with the transition. They accepted records from Crossroads but they did not want to participate with us in devising a structured transition plan." (*Id.* ¶ 9.) These allegations also establish a disputed issue of material fact regarding whether Crossroads failed to provide timely claims data to Synotnic.

For the reasons provided above, Plaintiffs are not entitled to summary judgment on their sixth count for breach of contract against Crossroads.

## IV. Crossroads' Counterclaims

As explained above, Plaintiffs also move for summary judgment on Crossroads' four counterclaims.

### 1. Breach of Contract

■ Crossroads' first counterclaim is that Plaintiffs breached the parties' services agreement by terminating Crossroads in September 2006. (Crossroads' Answer and Countercl. ¶¶ 70–80.) "Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir.2011) (citations omitted). For the reasons provided above, there is a disputed issue of material fact regarding whether Crossroads adequately performed under the parties' services agreement (second element). *See supra* pp. 389–90. There is also a disputed issue of material regarding whether Plaintiffs breached the services agreement (third element), but only on the narrow issue of whether Crossroads was paid for services and expenses incurred in September 2006, prior to its termination.

In a letter dated October 28, 2004, Churchill confirms that on October 18, 2004, the UMMF trustees and Churchill amended the services agreement to include the following clause: "Notwithstanding the above, this Agreement may be terminated by either party upon six (6) months' advance written notice." (Kipnees Decl. Ex. I, at UMMF 2315.) Pursuant to this clause, Plaintiffs claim they were within their rights to provide Crossroads with a six-months' termination notice in March 2006.[19] Crossroads argues the amendment

19. The original services agreement between Churchill and UMMF was for five years and commenced on January 1, 1999. (Crossroads' Answer and Countercl. ¶ 71.) It provided that either party could renew the agreement for two additional five year periods.

was unenforceable against it because Crossroads was not notified about the amendment and because the amendment was allegedly made after the assignment occurred. Crossroads is wrong.

The assignment agreement explicitly states it would not become effective until January 1, 2005. (Kipnees Decl. Ex. I, at UMMF 2314.) By that time, the services agreement had already been amended to allow for early termination, by either party, on six-months' notice. (*Id.* at UMMF 2315.) As a result, by the time the assignment became effective, the amendment was already part of the services agreement. As "an assignee[,]" Crossroads "stands in the shoes of its assignor and is entitled only to the rights of the assignor." *See Rahl v. Bande*, 328 B.R. 387, 404 (S.D.N.Y.2005) (citations omitted). Thus, Crossroads, like Churchill, was bound by the early termination amendment, and Plaintiffs did not breach the services agreement by exercising this right.

Although Crossroads claims, as part of its quantum meruit claim, that it was not paid for services and expenses incurred in September 2006 prior to its termination, because this allegation concerns a breach that allegedly occurred during the contract period, the Court considers this allegation as part of the breach of contract counterclaim. Plaintiffs contend Crossroads was paid for all of its services during the contract period. (Pl.'s 56.1 Stmt. ¶ 25.) Crossroads, as indicated above, disputes this allegation. According to Paolucci, Crossroads was not paid for the work it performed in September 2006 prior to its termination. (Paolucci Decl. ¶ 10.)

Because there is a disputed issue of material fact regarding whether Crossroads adequately performed under the parties' services agreement and whether

UMMF paid Crossroads for worked performed in September 2006, up to the point of termination, Plaintiffs are not entitled to summary judgment on Crossroads' counterclaim for breach of contract.

### 2. Defamation

Crossroads' second counterclaim is that Arthur Fishbein, James Crowley, Janet Sachs, Herbert Pobiner, Louis Flacks, and Paul Berkman, in their individual capacities, made defamatory statements about Crossroads. (Crossroads' Answer and Countercl. ¶¶ 81–88.) The problem with this counterclaim is that the UMMF trustees sued in their capacity as trustees, not individuals.

■ "Generally, under the 'opposing party' requirement in [Federal Rule of Civil Procedure 13], when a plaintiff commences an action in one capacity, the defendant may not assert a counterclaim against that plaintiff in a capacity different from that in which the plaintiff sued." *Banco Cent. de Paraguay v. Paraguay Humanitarian Found., Inc.*, No. 01 Civ. 9649(JFK), 2005 WL 2861598, at *2 (S.D.N.Y. Oct. 31, 2005) (citations omitted), *aff'd sub nom., DEF v. ABC*, 366 Fed. Appx. 250 (2d Cir.2010). Although "[t]here are recognized exceptions to the rule," *see Banco Cent. de Paraguay*, 2005 WL 2861598, at *2 (citation omitted), Crossroads does not offer any of them, much less explain why any is applicable. In fact, Crossroads does not even respond to Plaintiffs' "opposing party" argument.

In view of this fact—and because Crossroads sues the UMMF trustees in the wrong capacity—Plaintiffs are entitled to summary judgment on Crossroads' defa-

---

(*Id.*) It is also provided that if a party did not notify the other at least six months prior to

the expiration of the initial term, the agreement automatically renewed itself. (*Id.*)

mation counterclaim. *See Banco Cent. de Paraguay*, 2005 WL 2861598, at *2–5.

### 3. Contractual Indemnification

Crossroads' third counterclaim is for contractual indemnification of attorneys' fees and costs associated with defending this action. (Crossroads' Answer and Countercl. ¶¶ 89–94.) The counterclaim is based on the following provision in the services agreement:

> The Fund agrees to hold [Crossroads] and its directors, officers and employees harmless from any and all claims, lawsuits, settlements, judgments, costs, penalties and expenses, including attorney's fees, resulting from or arising out of or in connection with, any function of [Crossroads] under this Agreement, unless it is determined that the liability therefor was the direct consequence of criminal conduct, gross negligence or fraud on the part of [Crossroads] or any of its directors, officers or employees.
>
> * * *
>
> The Fund and [Crossroads] agree to promptly notify the other party of any claim arising hereunder. The Fund agrees that [Crossroads] will be listed as a named insured under the Fund's Fiduciary Liability/Errors and Omissions Policy, if any.

(Kipnees Decl. Ex. I ¶ 9.) Crossroads argues this clause requires Plaintiffs to indemnify it for its legal fees. Crossroads is wrong.

▆ As a preliminary matter, the parties agree that New York law governs the services agreement. "Under New York law, indemnification clauses regarding attorneys' fees are strictly construed 'to avoid reading into [the contract] a duty which the parties did not intend to be assumed.'" *Broadhurt Invs., LP v. Bank of New York Mellon*, No. 09 Civ.

1154(PKC), 2009 WL 4906096, at *2 (S.D.N.Y. Dec. 14, 2009) (alteration in original) (citation omitted). Courts "'should not infer a party's intention to waive the benefit of the rule [that parties are responsible for their own attorney's fees] unless the intention to do so is unmistakably clear from the language of the promise.'" *See id.* (citation omitted). A clause "that is not 'exclusively or unequivocally referable to claims between the parties themselves,' is insufficiently clear to overcome the general rule." *See id.* (citation omitted).

▆ In addition, "in contexts in which contracting parties could have anticipated that they would be subject to third-party claims, courts apply a presumption against concluding that indemnification clauses cover litigation costs incurred in the course of resolving non-third party claims." *See Goshawk Dedicated Ltd. v. Bank of New York*, No. 06 Civ. 13758(MHD), 2010 WL 1029547, at *7 (S.D.N.Y. Mar. 15, 2010) (citations omitted). Furthermore, where an indemnification clause contains provisions "that the court considers to be inapplicable to suits between parties—such as requiring that notice of a claim be given to the indemnitor . . .—courts have concluded that the contract does not evidence an unmistakably clear intent to indemnify attorneys' fees incurred in a lawsuit between the contracting parties." *Id.* at *6 (citations omitted).

The indemnification clause at issue here is not "'unmistakably clear'" that UMMF pledged to cover Crossroads' attorneys' fees in suits between the parties. While broad in scope—"any and all claims . . . arising out of . . . any function of [Crossroads] under this Agreement" (Kipnees Decl. Ex. I ¶ 9)—this language "'refers solely to the type of claims that are covered, not the identification of the parties who may assert those claims.'" *See*

*Broadhurt Invs., LP,* 2009 WL 4906096, at *3 (citation omitted).

Moreover, in view of Crossroads' broad responsibilities under the services agreement—such as, processing of all claims, collecting all contributions, and developing and maintaining a computerized system for the billing of all employers and the payment of claims (Kipnees Decl. Ex. I ¶ 1)—the Court has no doubt both parties anticipated situations where Crossroads "would be subject to third-party claims." *See Goshawk Dedicated Ltd.,* 2010 WL 1029547, at *7 (citations omitted). Examples of possible third-party claims include: a beneficiary who alleges Crossroads failed to properly process his or her claims; either AWF or the Local 210 Fund alleging Crossroads took more contribution money than it was allowed to; and a computer company who alleges Crossroads failed to pay it for services associated with Crossroads' duty to develop and maintain a computer system to monitor employer billing and payment of claims. *See, e.g., Broadhurt Invs., LP,* 2009 WL 4906096, at *3 n. 1 (providing examples of possible third party claims).

Finally, the indemnification clause at issue here requires the parties "to promptly notify the other party of any claim arising hereunder." (Kipnees Decl. I ¶ 9.) Because clauses such as these are "inapplicable to suits between [the] parties ... the contract does not evidence an unmistakably clear intent to indemnify attorneys' fees" in a lawsuit between the parties. *See Goshawk Dedicated Ltd.,* 2010 WL 1029547, at *6 (citations omitted).

In sum, because the indemnification clause is not " 'unmistakably clear' " that Plaintiffs intended to indemnify Cross-

roads for its attorneys' fees in a suit against itself, Plaintiffs are entitled to summary judgment on Crossroads' counterclaim for contractual indemnification of attorneys' fees.

### 4. Quantum Meruit

 Crossroads' last counterclaim is for quantum meruit for services performed and expenses incurred after UMMF terminated Crossroads. (Crossroads' Answer and Countercl. ¶¶ 95–97.) There are disputed issues of material fact regarding why Crossroads was unable to complete the transition before its termination became effective. Accordingly, Plaintiffs' motion for summary judgment on this counterclaim is DENIED.[20]

### CONCLUSION

For the reasons provided above, Plaintiffs' motion for partial summary judgment (Dkt.122) is GRANTED in part and DENIED in part, and the Local 210 Fund's motion for summary judgment (Dkt.129) is DENIED.

In particular:

- With respect to Plaintiffs' first two counts, the Local 210 Fund and Crossroads are directed to provide Plaintiffs with: (1) an accounting of all monies received from the Duane Reade settlement and (2) an accounting of all monies received pursuant to CBAs, in which UMMF is named, from January 1, 2005 to the present. Although Crossroads must participate in the accounting, Plaintiffs will only be entitled to restitution, if any, from the Local 210 Fund.

---

**20.** To the extent Crossroads claims it was not paid for services and expenses incurred in September 2006 prior to its termination, because this concerns damages that allegedly occurred during the contractual period, *see supra* p. 391, the Court considers this allegation as part of Crossroads' breach of contract counterclaim.

- Plaintiffs' fourth and fifth counts are DISMISSED.
- Crossroads' second and third counter-claims are DISMISSED.
- There are disputed issues of material fact regarding Plaintiffs' sixth count and Crossroads' first and fourth counterclaims. These claims will, accordingly, proceed.

SO ORDERED.