Leon **SILVERMAN**, James **Crowley, Janet Sachs, Herbert Pobiner, Louis Flacks,** and **Paul Berkman,** as **Trustees of the Union Mutual Medical Fund,** and **Union Mutual Medical Fund, Plaintiffs,**

v.

George **MIRANDA, Robert Bellach, Anthony Cerbone, Martin Sheer,** and **John Does 1–6** in their capacities as **Trustees of Teamsters Local 210 Affiliated Health and Insurance Fund,** and **Crossroads Healthcare Management, LLC, Defendants.**

No. 06–cv–13222 (BSJ)(GWG).

United States District Court, S.D. New York.

Jan. 4, 2013.

---

Robert J. Kipnees, Lowenstein Sandler PC, John Albert Fialcowitz, Lowenstein Sandler LLP, Roseland, NJ, for Plaintiffs.

Thomas Albert Thompson, Thomas A. Thompson, Law Offices, Yonkers, NY, Roland Richard Acevedo, Seiff Kretz & Abercrombie, New York, NY, for Defendants.

### Memorandum and Order

BARBARA S. JONES, District Judge.

In 2006, plaintiffs Leon Silverman, James Crowley, Janet Sachs, Herbert Pobiner, Louis Flacks, and Paul Berkman as Trustees of the Union Mutual Medical Fund ("UMMF"), and the UMMF (collectively "Plaintiffs") brought suit against defendants George Miranda, Robert Bellach, Anthony Cerbone, Martin Sheer, and John Does 1–6 in their capacities as Trustees of Teamsters Local 210 Affiliated Health and Insurance Fund ("Local 210 Fund"), and Crossroads Healthcare Management, LLC (collectively "Defendants") alleging underpayment of employer contributions in violation of various collective bargaining agreements ("CBAs") governed by the Employee Retirement Income Security Act ("ERISA").

Before the Court are Plaintiffs' Motion for a Sum Certain and Defendants' Motion for Partial Summary Judgment, which the Court now consolidates for decision. For the reasons that follow, Defendants' Motion for Partial Summary Judgment is DENIED and Plaintiffs' Motion for a Sum Certain is GRANTED in part and DENIED in part.

## PROCEDURAL BACKGROUND

This action was first filed on November 15, 2006. (Dkt. 1.) After extensive discovery and motion practice, this Court issued an Order granting summary judgment for Plaintiffs with respect to liability on Counts I and II of the First Amended Complaint.[1] (785 F.Supp.2d 375.) That Order also directed Defendants to provide Plaintiffs with an accounting identifying (1) all monies from a prior settlement with Duane Reade, Duane Reade, Inc., and DRI I, Inc. (the "Duane Reade Settlement"); and (2) all monies received pursuant to certain CBAs in which UMMF was named from January 1, 2005, to the date of the Order. (Id. at 393.) In an Order dated June 27, 2011, this Court granted in part and denied in part Defendants' Motion for Reconsideration.[2] (Dkt. 181.)

---

1. Given the extent of this litigation, the Court presumes familiarity with the facts as stated in the Order dated April 4, 2012. (See 785 F.Supp.2d 375, 378–83 (S.D.N.Y.2011).)

2. The Order affirmed the Court's finding of liability, but revised the relevant dates for the accounting with respect to the CBAs. (See Dkt. 181 at 3–5.)

On March 23, 2012, Plaintiffs filed the instant Motion for a Sum Certain, requesting summary judgment from this Court as to the amount owed by Defendants. (Dkt. 184.) On the same day, Defendants filed their Motion for Partial Summary Judgment, seeking a determination that a lesser amount was owed. (Dkt. 193.)

## LEGAL STANDARD

Fed.R.Civ.P. 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law" and an issue of fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden of showing that no genuine dispute exists as to any material fact rests with the movant and all ambiguities or factual inferences are drawn in favor of the party opposing summary judgment. *See id.* at 255, 106 S.Ct. 2505.

When both parties move for summary judgment, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993). "[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean,* 667 F.2d 305, 314 (2d Cir.1981). Summary judgment is appropriate "where the record tak-

en as a whole could not lead a rational trier of fact to find for the nonmoving party." *Kinsella v. Rumsfeld,* 320 F.3d 309, 311 (2d Cir.2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## DISCUSSION

Since Defendants' Motion for Partial Summary Judgment urges that dissipation of the claimed funds limits any recovery by Plaintiffs, the Court considers this motion before turning to the merits of Plaintiffs' Motion for a Sum Certain. Except where indicated, all material facts are undisputed. Where a fact is disputed, the Court draws all reasonable inferences against the party that brought the motion.

## I. Defendants' Motion for Partial Summary Judgment

Defendants argue that principles of equity and restitution preclude Plaintiffs' recovery beyond the sum of the lowest intermediate balances of the Local 210 Fund's Operating and Dental Accounts. (Defs.' Mem. of Law in Supp. of Mot. for Partial Summ. Judg. ("Support Memorandum") at 1–2.) Specifically, Defendants urge that Plaintiffs cannot recover because "where the property sought to be recovered or its proceeds have been dissipated so that no product remains, the plaintiff's claim is only that of a general creditor, and the plaintiff cannot enforce a constructive trust of or an equitable lien upon other property of the defendant." *Knudson,* 534 U.S. at 213–14, 122 S.Ct. 708 (citing Restatement (First) of Restitution § 215 (1937), Comment a (internal quotations and alterations omitted)).

Plaintiffs respond that their claim is an equitable lien by agreement and therefore exempt from both the tracing rules applied to restitutionary recovery and the lowest

intermediate balance rule. (Pls.' Mem. of Law in Opp. to Mot. for Partial Summ. Judg. ("Plaintiffs' Opposition") at 1–2.) Defendants object that Plaintiffs have pursued only equitable restitution throughout this litigation and are therefore estopped from arguing that their claim is an equitable lien by agreement. (Defs.' Reply Mem. of Law in Supp. of Mot. for Partial Summ. Judg. ("Defendants' Reply") at 1–2.)

First and foremost, neither party disputes that restitution can be either legal or equitable. *Great–W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). "The Supreme Court has delineated what forms of equitable restitution are available under § 502(a)(3), distinguishing permissible forms of equitable restitution such as employment of a constructive trust or of an equitable lien from forms of legal restitution." *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 103 (2d Cir.2005) (citing *Knudson*, 534 U.S. at 213, 122 S.Ct. 708). Thus, an equitable lien is a permissible form of equitable restitution under section 502(a)(3) of ERISA. Defendants focus instead on the Supreme Court's recognition that "an equitable lien sought as a matter of restitution, and an equitable lien by agreement, of the sort at issue in *Barnes* [*v. Alexander*, 232 U.S. 117, 34 S.Ct. 276, 58 L.Ed. 530 (1914) ], were different species of relief." *Sereboff v. Mid Atl. Med. Services, Inc.*, 547 U.S. 356, 364–65, 126 S.Ct. 1869, 164 L.Ed.2d 612 (2006) (internal quotations omitted). Relying on this distinction, Defendants maintain that Plaintiffs are attempting impermissibly to raise a new claim not originally advanced in this litigation. (Defs.' Reply at 1–2.)

Under the Federal Rules of Civil Procedure, a plaintiff's pleadings must "give the defendant fair notice of what [a] . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that 'it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.'" *Beckman v. U.S. Postal Serv.*, 79 F.Supp.2d 394, 407 (S.D.N.Y. 2000) (quoting *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 170 F.R.D. 111, 119 (S.D.N.Y.1997)). However, "a complaint need not correctly plead every legal theory supporting [a] claim." *Beckman*, 79 F.Supp.2d at 407. Where the "allegations of fact made in the complaint" and the "evidence upon which [the] plaintiffs rely" are "completely descriptive of the transactions and of the roles of the actors in them" as well as the "evidence and allegations relevant to a determination" of the claim at issue, it cannot be said that a defendant was not properly on notice. *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 711 (2d Cir.1980).

In this case, Plaintiffs have always sought relief under section 502(a)(3) of ERISA. This provision allows for "appropriate equitable relief," which includes an equitable lien by agreement. *See* 29 U.S.C. § 1132(a)(3)(B) (2012). Plaintiffs also cited both *Barnes* and *Sereboff*—cases that discuss equitable liens by agreement and on which they now rely—in order to argue that the Court could award equitable relief as early as their opposition to Defendants' first Motion to Dismiss. (*See* Dkt. 12 at 20–24.) Since Plaintiffs' theory regarding an equitable lien by agreement stems from the same arguments, factual allegations, authority, and evidence on which they have relied throughout this liti-

gation, there is no prejudice or lack of fair notice to Defendants.

■ The next question is whether Plaintiffs in fact have an equitable lien by agreement. In *Sereboff,* the Supreme Court cited *Barnes* as establishing the conditions under which an equitable lien by agreement is created.[3] *Barnes* allowed recovery of the portion of a fee contractually allocated to a recipient on the theory that "one of the familiar rules of equity [is] that a contract to convey a specific object even before it is acquired will make the contractor a trustee as soon as he gets a title to the thing." *Barnes,* 232 U.S. at 121, 34 S.Ct. 276; *see also In re Interborough Consol. Corp.,* 288 F. 334, 349 (2d Cir.1923) (citing *Barnes* and finding it "definitely settled in the federal courts that a promise based on a consideration to pay out of a particular fund creates a lien on the fund, which attaches to the fund when it comes into existence and which equity will enforce").

■ In order to establish an equitable lien under *Sereboff,* Plaintiffs must show (1) an agreement to pay funds under a covered plan that (2) specifically identifies a particular fund that is distinct from Defendants' general assets and (3) that the funds specifically identified are within the possession and control of Defendants.[4] Here, Defendants were contractually obligated to secure for Plaintiffs portions of employer contributions paid in accordance with certain CBAs and to remit those

sums to Plaintiffs. These sums are identifiable and distinct from Defendants' general assets. Moreover, the funds to which Plaintiffs claim they are entitled were actually conveyed to Defendants. Therefore, *Sereboff* provides restitutionary tracing rules do not apply. *See* 547 U.S. at 365, 126 S.Ct. 1869.

Defendants' attempts to claim lack of possession as in *Knudson* fall short. In that case, the funds sought by the petitioners were directed, by state court order, to be paid into a special trust and to the respondents' attorney. Consequently, the basis for the petitioners' claim in *Knudson* was "not that [the] respondents h[e]ld particular funds that, in good conscience, belong[ed] to petitioners," but rather that the petitioners were "contractually entitled to *some* funds for benefits that they [had] conferred." 534 U.S. at 214, 122 S.Ct. 708 (emphasis in original). Since the respondents had not actually received the funds, any recovery would come from their general assets. That "kind of restitution," the Supreme Court held, was the "imposition of personal liability" and sounded in law, not equity. *Id.*

The facts of this case are very different. Plaintiffs seek specific portions of specific funds paid to Defendants for a contractually specified purpose. *Cf. Sereboff,* 547 U.S. at 364, 126 S.Ct. 1869. All funds received under the CBAs were deposited directly into one account—the Local 210 Fund operating account.[5] (Dkt. 190, Decl. of Barry

---

**3.** Although *Barnes* dealt specifically with an attorney contingency fee, the Supreme Court clearly explained that the identities of the parties and the nature of the contractual arrangement were irrelevant. *See Sereboff,* 547 U.S. at 367, 126 S.Ct. 1869.

**4.** Although the issue typically arises in a different context, other courts have applied a similar analysis. *See, e.g., Coan v. Kaufman,* 457 F.3d 250, 263–64 (2d Cir.2006); *Union*

*Labor Life Ins. Co. v. Olsten Corp. Health & Welfare Benefit Plan,* 617 F.Supp.2d 131, 135 (E.D.N.Y.2008); *Bilyeu v. Morgan Stanley Long Term Disability Plan,* 683 F.3d 1083, 1092–93 (9th Cir.2012)

**5.** The operating account is maintained by the Local 210 Fund at Amalgamated Bank under Account No. 1166959.

N. Marzigliano ¶¶ 3, 8.) Unlike *Knudson*, Plaintiffs are not seeking payment of an amount equivalent to that of their contractual entitlement from Defendants' general assets without regard for whether Defendants actually came into possession of the funds. *Compare* 534 U.S. at 213, 122 S.Ct. 708. As such, Plaintiffs' recovery is not limited by Defendants' claim that the relevant funds are no longer within their control.

As in *Barnes*, Defendants' "obligation" under the CBA was "definitely limited to payment out of [a] fund . ... and therefore creates a lien upon the principle." *Id.* at 121–22, 34 S.Ct. 276. This contractual obligation created a lien on those portions of the employer contributions owed to UMMF. This lien attached to the funds when they were paid and can be enforced in equity. Thus, under the reasoning sanctioned in *Sereboff,* the tracing rules urged by Defendants do not apply.

Additionally, Defendants' reliance on the distinction between equitable restitution and an equitable lien by agreement misreads the decision in *Sereboff.* Defendants rely on *Knudson* to argue that tracing of the particular funds at issue is necessary if Plaintiffs' claim is characterized as equitable restitution rather than an equitable lien by agreement. The petitioners in *Sereboff* advanced a similar argument, denying "that any tracing was historically required when an equitable lien was imposed *by agreement*" but insisting that "such tracing was required when an equitable lien was predicated on a theory of *equitable restitution.*" [6] 547 U.S. at 365, 126 S.Ct. 1869 (internal quotations omitted) (emphasis in original).

The Supreme Court disagreed and rejected the argument that "all the restitutionary conditions—including restitutionary tracing rules—[apply] to every action for an equitable lien under § 502(a)(3)." *See* 547 U.S. at 365, 126 S.Ct. 1869. According to the Court, "*Knudson* simply described in general terms the conditions under which a fiduciary might recover when it was seeking equitable restitution under a provision like that at issue in this case." *Id.* Since there was "no need in *Knudson* to catalog all the circumstances in which equitable liens were available in equity," that case "concluded only that equitable restitution was unavailable because the funds sought were not in Knudson's possession." *Id.*

■ Thus, *Sereboff* established only that restitutionary tracing rules do not apply to every action for an equitable lien under § 502(a)(3); the Court did not hold that *only* equitable liens by agreement are exempt from traditional tracing rules. *Cf. Bilyeu v. Morgan Stanley Long Term Disability Plan*, 683 F.3d 1083, 1092 (9th Cir. 2012) ("The Court declined to say whether a rule requiring the plaintiff to trace the fund or property back to the plaintiff's own possession would apply to a claim for equitable restitution.") Consequently, a failure to establish an equitable lien by agreement would not necessarily trigger the application of strict tracing requirements.

Defendants also offer the unique suggestion that Plaintiffs cannot have an equitable lien by agreement because "[t]he [Local] 210 Fund ... never 'accepted or acted upon' the CBAs calling for the $8.00 trans-

---

**6.** Defendants thus attempt to cabin *Sereboff* to an issue with which the Supreme Court dealt only in passing. *See Sereboff,* 547 U.S. at 365, 126 S.Ct. 1869 ("*Barnes* confirms that no tracing requirement of the sort asserted by the [petitioners] applies to equitable liens by agreement or assignment .... To the extent [the respondent]'s action is proper under *Barnes*, therefore, its asserted inability to satisfy the 'strict tracing rules' for 'equitable restitution' is of no consequence. The [petitioners] concede as much ....").

fer because, as Plaintiffs correctly claim, the [Local] 210 Fund never paid the UMMF the $8.00 rate." (Defs.' Reply at 5.) That argument proves too clever by half. This Court has already ruled on the issue of Defendants' contractual liability. (*See* 785 F.Supp.2d 375.) Since this finding obviously rests upon a determination that a contract existed, it forecloses any argument that Defendants never "accepted" the CBA terms. Moreover, the Local 210 Fund assumed all liabilities of the former AWF. (*See* Dkt. 216, Decl. of Robert J. Kipnees, Ex. 1 at 121–122.) It would be strange indeed to hold that the same breach imposing liability was evidence that no agreement actually existed.

Finally, even if the Court were to apply the tracing requirements Defendants urge, it is far from clear that dissipation would preclude recovery. Defendants carefully ignore the fact that Plaintiffs may carry their burden as to tracing by "prov[ing] ... that the wrongdoer once had property legally or equitably belonging to him, [and] that he still holds the property *or property which is in whole or in part its product.*" Restatement (First) of Restitution § 215 (1937), Comment a (emphasis added).[7] In light of evidence in the record showing transfers from Defendants' investment accounts, Defendants' claims of dissipation are overstated.[8] Defendants urge that any

*res* claimable by Plaintiffs has been dissipated because the Local 210 Fund operating account has always been depleted before transferring monies from the Fund's investment accounts. (*See* Dkt. 196, Decl. of Barry N. Marzigliano ¶¶ 6–10; Ex. A–D.) Therefore, Defendants argue, they have extinguished any funds that rightfully belonged to Plaintiffs.

■■■ An equitable lien, however, requires only that a plaintiff clearly trace to "money or property identified as belonging in good conscience to the plaintiff." *Knudson*, 534 U.S. at 213, 122 S.Ct. 708. If those conditions are met, the Court may "order a defendant to transfer title (in the case of the constructive trust) or to give a security interest (in the case of the equitable lien) to a plaintiff who was, in the eyes of equity, the true owner." *Id.* Defendants' own submissions establish a direct connection between the contributions deposited in the Local 210 Fund operating account and the funds in Defendants' investment accounts. "The essential inquiry in any action for ... restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Paramount Film Distrib. Corp. v. State*, 30 N.Y.2d 415, 334 N.Y.S.2d 388, 285 N.E.2d 695 (1972) (cited by *Wilde v. Wilde*, 576 F.Supp.2d 595, 603 (S.D.N.Y.2008)).

---

7. Plaintiffs correctly note that a more recent version of the Restatement exists. However, since the Supreme Court cited to the Restatement (First) of Restitution in *Sereboff*—and it is the Supreme Court's decisions that are binding—this Court follows suit.

8. The facts in this case depart from those described in the Restatement. *See, e.g.,* Restatement (First) of Restitution § 215, Comment a ("[I]f the wrongdoer has used the money of the claimant in speculation and has lost it all, the claimant cannot enforce a constructive trust of or an equitable lien upon other property of the wrongdoer, and has only a personal claim against the wrongdoer, and

is not entitled to priority over other creditors of the wrongdoer. Similarly, where the wrongdoer uses the property of another in discharging an obligation of the wrongdoer, the claimant is not entitled to priority over other creditors of the wrongdoer ....'"). Unlike this case, these examples do not involve a solvent debtor who claims dissipation while replacing the relevant funds with other funds to which he holds equal title. It is not clear in this case how the tracing rules would serve their traditional function of safeguarding other innocent creditors and later bona fide purchasers.

 But for the unlawful retention of Plaintiffs' funds, Defendants would have withdrawn precisely the same amount from their investment accounts and deposited it directly into the Local 210 Fund operating account. Because Defendants freely used funds from their investment accounts to replenish the Local 210 operating account—and would have done so again had the unlawfully retained funds not been available in the operating account to cover the union's financial obligations drawn on that account—considerations of equity weigh heavily against Defendants' attempts sharply to distinguish between the operating and investment accounts. By virtue of Defendants' established practice, there exists a direct correlation between specific accounts owned and controlled by Defendants, as well as a substantial transactional nexus between related sums in the Local 210 Fund operating account and Defendants' investment accounts.[9] On these facts Plaintiffs are entitled, in good conscience and in the eyes of equity, to trace their funds to Defendants' investment accounts.[10]

For the reasons explained above, the Court concludes that Plaintiffs' may seek recovery for an equitable lien by agreement against the assets held by Defendants in the Local 210 operating and dental accounts, as well as in Defendants' investment accounts from which Defendants replenished the operating fund. Additionally Plaintiffs' recovery is not limited by the "intermediate balance" rule, and Plaintiffs are entitled to recover the full sum of $1,909,736.26 plus interest and costs.

## II. Plaintiffs' Motion for a Sum Certain

In their motion, Plaintiffs move for an entry of a sum certain on several issues that together determine the amount owed by Defendants. The Court considers each of these issues in turn.

### A. Overpayments Alleged by Defendants

 Plaintiffs first assert that Defendants have attempted to offset their liability to Plaintiffs by the amount of overpayments allegedly made to UMMF during the period before February 2006. (Pls.' Mem. of Law in Supp. of Mot. for Sum Certain ("Plaintiffs' Support Memorandum") at 10–12.) Defendants are entitled to offset Plaintiffs' recovery with overpayments already made only if Defendants can present evidence of a valid claim for reimbursement. As the maximum statute

9. Defendants rely solely on *In re Drexel Burnham Lambert Group, Inc.*, 142 B.R. 633, 637 (S.D.N.Y.1992), to argue that the "intermediate balance" rule is applicable here. In that case, however, the party seeking recovery sought to encumber "accounts of associated but *independent* subsidiary corporations in order to find its money." 142 B.R. at 638 (S.D.N.Y.1992) (emphasis added). Plaintiffs make no such attempt here; rather, they urge that, given the transfers from Defendants' investment accounts, there is no basis for limiting the scope of the Court's focus to solely Local 210 Fund's operating and dental funds. As indicated above, Plaintiffs are correct. Defendants had "defeasible title to the whole [operating] fund" as well as their investment accounts. *Cunningham*, 265 U.S. at 13, 44 S.Ct. 424. To presume that Defendants consistently isolated and extinguished the funds owed to the UMMF before replenishing the operating fund "would be carrying the fiction [of the intermediate balance rule] to a fantastic conclusion." *Id.* Where a defendant is not insolvent and merely seeks artificially to partition its own funds, the legal fiction of the "intermediate balance" rule enables a shell game that grounds tracing on hollow technicalities.

10. Defendants have provided no evidence that the investment accounts were ever exhausted.

of limitations under ERISA is six years, any such claims are now barred. *See* 29 U.S.C. § 1113 (2012). Since Defendants have no viable claim for reimbursement, they are not entitled to deduct the amount of alleged overpayments from the amount owed to the UMMF.

Defendants respond, however, that they are not seeking to offset their liability by the amount of any overpayments. (Defs.' R. 56.1 Counterstmt. ¶¶ 14–15.) Rather, Defendants assert that the reduction is justified because the contributions Plaintiffs seek were "paid solely to the AWF." (*Id.* at ¶ 14.) The uncontroverted evidence in the record, however, indicates that Defendants assumed all liabilities attributable to the AWF. (Dkt. 216, Decl. of Robert J. Kipnees, Ex. 1 at 121–122.) Since Defendants assumed these liabilities they cannot now disclaim them.

Accordingly, the Court concludes that Plaintiffs are entitled to recover all unpaid contributions during this period, an amount equivalent to $73,285.36 plus interest.

### B. Duane Reade Settlement

Plaintiffs claim that Defendants are liable for eighty percent of the Duane Reade Settlement because eighty percent of the assets of the AWF were transferred to the Local 210 Fund.[11] (Pls.' Reply Mem. in Supp. of Mot. for Sum Certain ("Plaintiffs' Reply") at 5.) Defendants respond that, since all funds from the Duane Reade settlement were deposited into accounts owned by the AWF and the Local 210 Fund was formed after the settlement was paid, there is no way to account for the settlement funds and therefore no *res* for

Plaintiffs to pursue. (Defs.' Mem. in Opp. to Mot. for Sum Certain ("Defendants' Opposition") at 5–6.) If indeed these funds cannot be traced with accuracy, then there may be a disputed issue of material fact that precludes summary judgment.

The problem for Defendants, however, is that their argument is inconsistent with the evidence. Defendants do not dispute that on April 24, 2006, Duane Reade issued a check in the amount of $825,169.54 to the AWF. (Defs.' R. 56.1 Counterstmt. ¶ B; Decl. of Thomas A. Thompson ¶ 3, Ex. B.) Similarly, Defendants concede that on April 26, 2006, AWF deposited the check from Duane Reade in its account. (Defs.' R. 56.1 Counterstmt. ¶ C; Decl. of Thomas A. Thompson ¶ 4, Ex. C.)

Defendants argue that summary judgment is inappropriate because genuine issues of material fact remain regarding any AWF account(s) into which the settlement funds were deposited and any AWF account(s) from which funds were later transferred after the bifurcation of the AWF. (Defs.' Opp. at 6–7.) Plaintiffs respond that, based on all the evidence in the record, there is no material factual dispute. Plaintiffs are correct. At his deposition, George Miranda, a former trustee of the AWF and one of the current defendants, testified that no portion of the Duane Reade settlement was transferred to UMMF and confirmed that on May 22, 2006, $825,169.54 was transferred out of the AWF and "[p]robably to the [L]ocal [210 Fund], then to the Health and Insurance Fund." (Dkt. 216, Decl. of Robert J. Kipnees, Ex. 1 at 152.) In the absence of contrary evidence from Defendants,[12] this

---

11. The parties do not dispute that this is the percentage of assets transferred from the AWF to the Local 210 Fund.

12. Defendants have failed to provide an accounting of the Duane Reade settlement as ordered by this Court on April 12, 2011. (785 F.Supp.2d 375.) Despite their argument that

evidence is sufficient to show Defendants' possession of the eighty percent of the settlement sought by Plaintiffs.

Thus, the Court concludes that Plaintiffs are entitled to recover the requested eighty percent of the funds owed to the UMMF from the Duane Read Settlement, an amount equivalent to $89,491.53 plus interest.

## C. Manhattan Drug Payments

Plaintiffs argue that the accounting provided by Defendants does not reflect the correct rate for contributions by the Manhattan Drug Company ("MDC"). (Pls.' Supp. Mem. at 12.) The accounting relies on a contribution of $0.10 per employee per week for this period, while the CBA governing the Manhattan Drug contributions fixes this rate at $8.00 per employee per week. (Dkt. 202, Decl. of Robert J. Kipness, Ex. 13.) Thus, Plaintiffs argue that Defendants' liability is greater than the accounting reflects.

Defendants respond that, while the CBA does provide for the $8.00 rate, this amount was the product of a mutual mistake by the contracting parties and therefore does not reflect the actual rate to be applied. (Defs.' Opp. at 10–12.) Plaintiff notes that this Court previously held that the UMMF was a third party beneficiary under the CBA, and correctly argues that no amendment could be made without its approval after its rights under the CBA had vested. (Pls.' Reply at 7–8.) This is not dispositive, however, as a mutual mistake flows from the intent of the parties at the time of the contract's formation. Reformation of a mutually mistaken term, therefore, would not require the approval of the UMMF.

Alleging a mutual mistake is as far as Defendants can go, however. Since Defendants have offered no evidence that the MDC acknowledged a mistake or acquiesced to reformation, this argument "fails, if for no other reason, because [defendants] do[ ] not identify any mistake by the parties." *Cobalt Multifamily Investors I, LLC v. Bridge Capital (USVI), LLC*, No. 06–CIV–5738, 2007 WL 2584926, at *9 (S.D.N.Y. Sept. 7, 2007). "The burden upon a party seeking reformation is a heavy one since it is presumed that a deliberately prepared and executed written instrument accurately reflects the true intention of the parties." *Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC*, 724 F.Supp.2d 407, 416 (S.D.N.Y.2010) (citing *William P. Pahl Equip. Corp. v. Kassis*, 182 A.D.2d 22, 588 N.Y.S.2d 8, 12 (1992)).[13]

Pleading a claim of mutual mistake requires factual allegations establishing (1) that both contracting parties

they are "in no position to make that accounting" (Defs.' Opp. at 5), Defendants have made no showing that the relevant documents could not be obtained by subpoena or other reasonable efforts. It would be inequitable under these circumstances to charge Plaintiffs with a burden to adduce additional evidence concerning the transfer of the settlement funds.

**13.** While there is no general federal common law, federal courts may create federal common law where such development is necessary to interpret a federal statute. The Supreme Court has explicitly approved this development in ERISA cases. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Absent an express choice of law provision, a claim for reformation under ERISA is governed by federal common law. *Scarangella v. Group Health Inc.*, No. 05–CIV–5298, 2009 WL 764454, at *19 (S.D.N.Y. Mar. 24, 2009); *Aramony v. United Way of Am.*, 949 F.Supp. 1080, 1086 (S.D.N.Y.1996). Federal courts in this circuit have frequently cited New York state law when considering a claim of mutual mistake, *see, e.g., Scarangella*, 2009 WL 764454, at *19, and the parties do not dispute the applicability of New York law to this case.

shared the same erroneous belief as to a material fact and (2) that their acts do not in fact accomplish their mutual intent. *FSP, Inc. v. Societe Generale,* No. 02–CIV–4786, 2005 WL 475986, at *15 (S.D.N.Y. Feb. 28, 2005). Success on a claim for reformation requires clear and convincing evidence. *Healy v. Rich Products Corp.,* 981 F.2d 68, 73 (2d Cir.1992) (citing *Seebold v. Halmar Constr. Corp.,* 146 A.D.2d 886, 536 N.Y.S.2d 871, 872 (1989)).

■■■ Defendants rely exclusively on three documents: (1) a letter from Defendants to the MDC dated July 18, 2007, that purports to identify an error in the contract; (2) a memorandum of agreement (the "Memorandum of Agreement") signed by the MDC and Defendants on August 22, 2006, that set the terms for a new CBA; and (3) a signed letter of agreement (the "Proposal Letter") in which the MDC and Defendants agreed to amend the CBA.[14] (*See* Defs.' Mem. in Opp. to Mot. for Sum Certain at 10–11.) These documents are insufficient to prove a mutual mistake in the CBA between the MDC and Defendants.

First, the letter from Defendants to the MDC, dated July 18, 2007, that identifies the alleged error in the contract is not signed or otherwise acknowledged by the MDC. (*See* Dkt. 210, Decl. of Robert Bellach at Ex. 14.) Thus it is incapable of showing notice, knowledge, or acquiescence on the part of the MDC with respect to any belatedly discovered mistake. Second, the Memorandum of Agreement, which was signed on August 22, 2006, does not mention the rates for employer contributions and merely provides that "[a]ll other terms and conditions of the aforementioned Collective Bargaining Agreement between the parties ... shall remain in full force and effect unless specifically modified herein." (*Id.* at Ex. 14, subpt. B.) This document is insufficient to show the knowledge or intent of the MDC at the time the CBA was signed.

Defendants argue, however, that these documents prove the intent of the parties when viewed in conjunction with the Proposal Letter, in which the MDC and Defendants agreed to a proposed amendment to the CBA. (*See id.* at Ex. 14, subpt. A.) The Proposal Letter reflects an offer by Defendants—and apparent agreement by the MDC—to amend the CBA to include lower contributions to the UMMF.[15] (*Id.*) Defendants rely on this agreement to argue that the later Memorandum of Agreement was intended to incorporate the proposed amendment. (*See* Defs.' Opp. at 10–11.) Of course, since there is no evidence that the UMMF ever agreed to an amendment prior to the expiration of the CBA the proposal could not have become part of the CBA before August 30, 2006. *See Trustees of Four Joint Boards Health & Welfare & Pension Funds v. Penn Plastics, Inc.,* 864 F.Supp. 342, 347 n. 6

---

**14.** These documents are found only in Exhibit 14 to a declaration offered by Robert Bellach. (*See* Dkt. 210, Decl. of Robert Bellach at Ex. 14, subpts. A–C.) There was no testimony taken on this evidence. (*See* Tr. of Hr'g on September 10, 2012, at 13.) For the reasons discussed in Part II.D below, this declaration is not admissible evidence. The Court nonetheless discusses this evidence and finds that, even if admissible, it is legally insufficient to support Defendants' claim.

**15.** It is difficult to determine when Employer's Representative for the MDC actually signed this agreement, which is problematic since Defendants rely heavily on the specific sequence in which the above agreements were signed. The date noted on the document is far from legible and Defendant did not file the original with the Court. At the very least, the limited legibility of the agreement date undermines the weight and reliability of this evidence.

(S.D.N.Y.1994) ("[A] promisor and promisee are not free to modify or discharge the promisor's duty to an intended third-party beneficiary of the contract after the beneficiary's rights have vested."). Legally speaking, then, the proposed agreement could not have been one of the "terms and conditions" intended to "remain in full force and effect" as per the August 22, 2006, memorandum of agreement.[16] (Dkt. 210, Decl. of Robert Bellach at Ex. 14, subpt. B.) Moreover, even assuming *arguendo* that Defendants' trio of documents shows the intent of the contracting parties, it does not shown intent contemporaneous with the signing of the new CBA. *Cf. Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 98 F.Supp.2d 498, 507 (S.D.N.Y. 2000) (finding "no ground for reformation" where a party failed to offer "contemporaneous" evidence of the other contracting party's understanding).

Without proper citation to admissible evidence, Defendants' claim of a mutual mistake is untenable. Defendants have "failed to point to any admissible, contemporaneous evidence of the parties' alleged mutual mistake." *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 607 F.Supp.2d 600, 604 (S.D.N.Y.2009). Accordingly, Defendants may not assert mutual mistake as a defense to liability on summary judgment and have no legally viable claim for reformation of the contract. *See Investors Ins. Co. of Am. v. Dorinco Reinsurance Co.*, 917 F.2d 100, 105 (2d Cir.1990) (granting summary judgment and rejecting a claim for mutual mistake where a party "offered no evidence whatsoever" that the other contracting party was similarly mistaken).

Thus, the Court concludes that there was no mutual mistake as to terms of the MDC CBA and Plaintiffs are entitled to recover all contributions for the relevant period at the rate specified in the contract, an amount equivalent to $103,302.64 plus interest.

## D. Termination of the CBAs

 Plaintiffs and Defendants also dispute the termination date of five CBA agreements, including those governing contributions from Purepac/Alpharma/Actavis ("Alpharma"), Bellco Drug Corp. ("Bellco"), Givaudan Fragrances Corp. ("Givaudan"), Ivax Pharmaceutical Corp. ("Ivax"), and West–Ward Pharmaceuticals Corp. ("West–Ward"). Plaintiffs argue that there is no evidence the CBAs were properly terminated before they automatically renewed and therefore that they are due additional compensation over a longer period. (Pls.' Supp. Mem. at 14–15.) In their response, Defendants adduced new evidence of notice given to the employer-contributors of these CBAs that may have prevented the automatic renewal of the agreements containing higher UMMF contribution rates. (*See* Defs.' Opp. at 12–16.)

Plaintiffs rightly complain that the evidence supplied by Defendants in support of their opposition was never produced during discovery (Pls.' Reply at 8.) Indeed, Defendants concede that Plaintiffs made several requests for the production of these very documents, but that they were never produced.[17] (*See* Defs.' R. 56.1

---

**16.** In fact, perhaps the more likely conclusion is that the language of the Memorandum of Agreement was intended specifically to repudiate any prior agreement altering the terms of the contract. This is supported by evidence from Plaintiffs that shows the MDC believed, as of December 15, 2011, that the CBA language providing for $8.00 payments was still in force. (*See* Dkt. 189, Decl. of Ryan J. Cooper ¶ 2; Dkt. 216, Decl. of Robert J. Kipnees, Ex. 13.)

**17.** Of course, as this Court suggested at oral argument, Defendants were always capable of issuing a subpoena for the documents at is-

Counterstmt. ¶¶ 26–27.) Plaintiffs urge that Defendants' repeated failure to provide this evidence precludes its use now, as an element of Defendants' case. There is some support for this position. *See, e.g., Engl v. Aetna Life Ins. Co.*, 139 F.2d 469, 473 (2d Cir.1943).

Defendants respond, however, that their failure to produce these documents was due to the fact that they did not have the documents in their custody or control. (Defs.' R. 56.1 Counterstmt. ¶¶ 26–27.) The serendipitous appearance of this evidence, Defendants assert, is purely the product of "courtesy" on the part of the union. (Tr. of Hr'g on September 10, 2012 at 44.) The Court is not persuaded. Defendants' counsel represented that the evidence at issue was requested from the union after Defendants were served with Plaintiffs' Motion for a Sum Certain and apparently promptly produced in time for inclusion as part of Defendants' opposition to that motion. (*Id.*)

■■■■ The court has wide discretion when it comes to imposing discovery sanctions. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir.2002). One goal of discovery sanctions is to "ensure that a party will not be able to profit from its failure to comply with discovery requirements." *Monaghan v. SZS 33 Associates, L.P.*, 154 F.R.D. 87, 90 (S.D.N.Y.1994). To that end, "[i]f a party fails to provide information ... the party is not allowed to use that information or witness to supply evidence on a motion ...." Fed.R.Civ.P. 37(c)(2), (1). When considering sanctions, though not a prerequisite a court should also consider the

extent to which a non-compliant party's conduct has prejudiced the opposing side. *See Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Employees Int'l Union*, 212 F.R.D. 178, 229 (S.D.N.Y. 2003), *upheld on recons.*, No. 00–CIV– 3613, 2004 WL 1943099 (S.D.N.Y. Aug. 27, 2004).

■■■■ Defendants concede that Plaintiffs made four separate requests for this very evidence. (*See* Defs.' R. 56.1 Counterstmt. ¶ 26.) Defendants knew that this evidence was material to issues in this litigation and likely knew that the evidence would be necessary to rebut Plaintiffs' allegations. Finally, despite Defendants' insistence that they lacked custody of or control over the documents in question, Defendants were able to acquire these documents in short order without resort to a subpoena. Under these circumstances the Court is skeptical that this evidence was truly outside Defendants' custody or control and Defendants' failure to provide it to Plaintiffs was clearly prejudicial. Accordingly, Defendants may not now rely on the same evidence they failed to produce.

■■■■ Even were the Court to overlook Defendants' failure timely to produce this evidence, however, it is not admissible and could not be considered on summary judgment. Defendants appended the documents purporting to give notice prior to the renewal of the CBAs to declarations submitted by Adrian Merced and Robert Bellach. (*See* Defs.' R. 56.1 Counterstmt. ¶¶ 28–32.) Generally, declarations may be submitted in lieu of sworn testimony; however, a declaration must conform with the requirements of 28 U.S.C. § 1746 in order

sue. (*See* Tr. of Hr'g on September 10, 2012 at 44.) On the other hand, "[f]or documents to which Plaintiffs believe they are entitled, but Defendant claims to not be able to locate with reasonable efforts, Plaintiffs always ha[d] the option of serving third-party subpoenas to

obtain additional documents pursuant to Rule 45 of the Federal Rules of Civil Procedure." *Elliott v. City of New York*, No. 06–CIV–296, 2009 WL 2972987, at *2 (S.D.N.Y. Sept. 17, 2009).

to be admissible. *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 65 (2d Cir.1999). In substance, this provision mandates that a declaration executed within the United States certify that the contents is (1) true and correct; (2) offered under penalty of perjury; (3) dated; and (4) signed. 28 U.S.C. § 1746(2) (2012).

While the declarations submitted on behalf of Adrian Merced and Robert Bellach are dated, aver that they are "true and accurate," and state they are made "under penalty of perjury," they are not signed.[18] (*See* Dkt. 209 at 3; Dkt. 210 at 6.) An unsigned submission does not comply with section 1746 and is not admissible evidence. *Cf. Azkour v. Little Rest Twelve, Inc.,* No. 10–CIV–4132, 2012 WL 402049, at *3 n. 1 (S.D.N.Y. Feb. 7, 2012), *adopted,* No. 10–CIV–4132, 2012 WL 1026730 (S.D.N.Y. Mar. 27, 2012); *J.R.J. Enterprises, Inc. v. M/V CAP ORTEGAL,* No. 07–CIV–6457, 2009 WL 1704273, at *4 n. 4 (S.D.N.Y. Mar. 31, 2009). Though rigid adherence to the formula of section 1746 is not required to validate a declaration, this deficiency is significant and cannot be overlooked in this case. First, Defendants have disclaimed ownership of, control over, or responsibility for the documents in question.[19] (*See* Defs.' R. 56.1 Counterstmt. ¶ 27; Tr. of Hr'g on September 10, 2012, at 44.) This makes unverified acceptance of the evidence problematic, as Defendants cannot meaningfully attest to the documents' authenticity or accuracy. Second, these documents surfaced extremely late in this litigation and therefore have largely avoided the crucible of adversarial examination. Third, the evidence is crucial to the determination of a material matter and fairness counsels less leniency toward the form of submitted evidence.

Under these circumstances, Defendants' failure to submit signed declarations precludes admission of the evidence. *Cf. Reynolds v. Sealift, Inc.,* 311 Fed.Appx. 422, 425 (2d Cir.2009) (holding that a district court acted within its discretion when excluding three affidavits that lacked a precise date one affidavit that described events to which knowledge was previously denied); *O'Shea v. Childtime Childcare, Inc.,* No. 01–CIV–1264, 2002 WL 31738936, at *3 (N.D.N.Y. Dec. 2, 2002) (finding that third-party declarations, submitted on cross-motions for summary judgment may be considered only if they are signed under penalty of perjury). At summary judgment, this Court can rely only on admissible evidence and therefore does not consider the Bellach and Merced declarations. *See Spiegel v. Schulmann,* 604 F.3d 72, 81 (2d Cir.2010). Since these declarations are the only evidence offered by Defendants to show that the Alpharma, Bellco, Givaudan,[20] Ivax, and West–Ward

---

18. The declarations in question both contain an empty signature line and the character "/s/" in lieu of an actual signature. (*See* Dkt. 209 at 3; Dkt. 210 at 6.) In contrast, the declaration submitted by Thomas A. Thompson is signed. (Dkt. 211 at 2.) The character "/s/" is permissible only as the electronic signature of the person filing a document via the Electronic Case Filing system. *See* ELECTRONIC CASE FILING RULES & INSTRUCTIONS, § 8.2 (2011), *available at* http://www.nysd.uscourts.gov/ecf/rules_040411.pdf.

19. Indeed, lack of custody or control over these documents is the very explanation they offer for their tardy submission despite previous requests for production by Plaintiffs. (*See* Tr. of Hr'g on September 10, 2012, at 44.) Were Defendants to assert otherwise, of course, the Court would be compelled to conclude that the evidence had been purposefully withheld.

20. With respect to Givaudan, even Defendants concede that they failed to given proper notice of intent to renegotiate before the contract renewed. (*See* Defs.' Opp. at 13–14.)

CBAs were renegotiated (see Defs.' R. 56.1 Counterstmt. ¶¶ 28–32), the Court accepts as admitted Plaintiff's assertions that Defendants failed to renew the CBAs in accordance with the contract terms and that the CBAs therefore automatically renewed. See Local Civil Rule 56.1(c), (d).

Therefore, the Court concludes that Plaintiffs are entitled to recover all contributions for the relevant period at the rate specified in the original CBAs, an amount equivalent to $84,861.80 plus interest for Alpharma; $38,704.09 plus interest for Bellco; $49,975.40 plus interest for Givaudan; $26,465.00 plus interest for Ivax; and $84,955.25 plus interest for West–Ward.

### E. Interest and Attorneys' Fees

Finally, Plaintiffs seek awards for pre-judgment interest, post-judgment interest, and attorneys' fees. In opposition, Defendants assert only that any claim for interest or attorneys' is premature.[21] (Defs.' Opp. at 17.)

#### 1. Prejudgment Interest

Under ERISA, a district court has discretion to award prejudgment interest. Slupinski v. First Unum Life Ins. Co., 554 F.3d 38, 53–54 (2d Cir.2009). "Like an award of attorney's fees for a successful ERISA claim by an employee benefit plan participant, 'prejudgment interest is an element of the plaintiff's complete compensation." Id. (internal alterations omitted). Prejudgment interest is intended to ensure that an injured party is fully compensated. See City of Milwaukee v. Cement Div., Nat. Gypsum Co., 515 U.S. 189, 195, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995). "In addition, an award of prejudgment interest may be needed in order to ensure that the defendant not enjoy a

windfall as a result of its wrongdoing." Slupinski, 554 F.3d at 54.

In deciding whether to award prejudgment interest, the Court must consider "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." Wickham Contracting Co., Inc. v. Local Union No. 3, Int'l Broth. of Elec. Workers, AFL–CIO, 955 F.2d 831, 834 (2d Cir.1992); accord Jones v. UNUM Life Ins. Co. of Am., 223 F.3d 130, 139 (2d Cir.2000). The Court is also mindful that prejudgment interest is "particularly appropriate as a means of ensuring that plaintiffs are made whole and that defendants do not profit by their failure to comply with their ERISA obligations." Algie v. RCA Global Communications, Inc., 891 F.Supp. 875, 899 (S.D.N.Y.1994) aff'd, 60 F.3d 956 (2d Cir. 1995). Applying these principles to the facts of this case, the Court concludes that prejudgment interest is necessary to fully compensate UMMF and to avoid unjust enrichment of Defendants.

Neither ERISA nor other federal statutes, however, fix the rate at which prejudgment interest should be awarded. Cf. Jones v. UNUM Life Ins. Co. of Am., 223 F.3d 130, 139 (2d Cir.2000). However, "the same considerations that inform the court's decision whether or not to award interest at all should inform the court's choice of interest rate." Jones, 223 F.3d at 139. Plaintiffs urge that this Court apply a 5.80% annual interest rate, which is the average return of UMMF's investments over the relevant period, to

---

21. At the hearing held on September 10, 2012, Defendants' counsel represented that he also intended to apply for attorneys' fees.

(Tr. of Hr'g on September 10, 2012, at 33.) To date, the Court has received no such application.

any award of prejudgment interest. (Pls.' Supp. Mem. at 17.)

The UMMF is correct that some amount of interest is necessary to fully compensate the fund that, like all such funds, relies at least in part on investment appreciation to subsist. *See Wachtell, Lipton, Rosen & Katz v. C.I.R.*, 26 F.3d 291, 293 (2d Cir. 1994). The Court concludes, however, that the proper rate of return to be applied is the federal interest rate applicable to post-judgment interest, which represents a standard rate of return on investments during the relevant period. *See* 28 U.S.C. § 1961 (2012).

A greater rate is not equitable in this case. Contrary to Plaintiffs' suggestion, there is no guarantee that the UMMF's investments would have yielded the return it seeks "but for Local 210 Trustees' unlawful misappropriation of contributions." (Pls.' Supp. Mem. at 18.) Because it measures a standard rate of return, the federal interest rate is less speculative than projections based on an average of Plaintiffs' returns. Moreover, while this award may be less than the amount Plaintiffs proposed, any award to the UMMF will necessarily be paid out from funds that otherwise would assist the beneficiaries of the Local 210 Fund.[22] In light of Plaintiffs' other recovery, the Court concludes that equity does not demand that it underwrite the entirety of UMMF's lost investment opportunities.

Additionally, the concomitant goal of avoiding unjust enrichment also counsels in favor of relying on the federal interest rate. Any windfall to Defendants in this case flows not from Plaintiffs' decreased capitalization due to underpayment, but rather from Defendants' *increased* capitalization and liquidity resulting from its unlawful retention of the amounts owed. Under these circumstances, any unjust enrichment is corrected by disgorgement of additional profits that inured to Defendants on the basis of the unlawfully retained amounts. These profits are properly and adequately measured by the federal interest rate over the relevant period. *Cf. Algie*, 891 F.Supp. at 899 (applying the federal interest rate applicable to post-judgment interest because it "more appropriately . . . provide[d] a closer approximation of the likely return on plaintiffs' unpaid benefits"); *Jones*, 223 F.3d at 140.

Accordingly, Plaintiffs are entitled to prejudgment interest "at a rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding." 28 U.S.C. § 1961(a) (2012).

### 2. Post–Judgment Interest

Plaintiffs also request post-judgment pursuant to 28 U.S.C. § 1961. Such interest compounds daily "shall be calculated from the date of the entry of the judgment." *Id.* Pursuant to this provision, Plaintiffs are entitled to post-judgment interest at the rate identified above, *i.e.* the weekly average 1–year constant maturity Treasury yield for the preceding calendar week. *See id.*

### F. Attorneys' Fees

An award of attorney's fees under ERISA is governed by 29 U.S.C. § 1132(g)(1). When contemplating such an award, the Court considers five factors

---

**22.** Conscious of the principles and aims of equity, the Court finds that it is appropriate to consider the effect of any award on the beneficiaries of the Local 210 Fund who had no authority with respect to the management of the Fund. *Cf. Brown v. Health Care & Ret. Corp. of Am.*, 25 F.3d 90, 94 (2d Cir.1994) (considering the effect of a setoff on individual beneficiaries).

including "(1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants." *Chambless v. Masters, Mates & Pilots Pension Plan,* 815 F.2d 869, 871 (2d Cir.1987).

Though some factors may apply to varying degrees here, the Court concludes that an award of attorneys' fees is not appropriate. On these facts, the Court is not persuaded that such an award would facilitate deterrence as contemplated under section 1132(g)(1), nor can the Court ignore the implications for pension plan participants dependent on Defendants. Thus, the Court finds that Plaintiffs are not entitled to an award of attorneys' fees.

### CONCLUSION

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment is DENIED and Plaintiffs' Motion for a Sum Certain is GRANTED in part and DENIED in part. Plaintiff is awarded judgment in the amount of $2,460,777.33 plus interest. The Clerk of the Court is directed to terminate the above motions (dkt. 184, 193) and to close this case.

**SO ORDERED.**